COMMONWEALTH *vs.* LOUIS S. JACOBSON.

SAME *vs.* SAME.

Worcester.   May 24, June 4, 1927.— June 29, 1927.

Present: CROSBY, CARROLL, WAIT, & SANDERSON, JJ.

*Larceny,* By false pretences.  *Conspiracy.  Evidence,* Competency.  *Practice, Criminal,* Exceptions.  *Cattle.  Words,* "Representative."

While G. L. c. 129, § 33, as amended by St. 1922, c. 353, § 3, and the rules and regulations prescribed thereunder by the division of animal industry and in force in 1925, permitted certain acts in connection with a tuberculin test of cattle to be performed by a representative of the owner, the word "representative" as there used referred to a person authorized and purporting to act as agent of the owner and not to a person who pretended to be the owner when in fact he had no title to the cattle.

At the trial together of two indictments against one, engaged in the business of selling meats and provisions and buying and selling cattle for slaughter, and a bank cashier, the first indictment charging conspiracy to steal money from the Commonwealth and the second indictment charging larceny of the money, the second indictment was nol prossed as to the second defendant and he pleaded guilty to the first indictment. There was evidence as follows: In 1923 the first defendant had applied to the department of animal industry for a tuberculin test of his herd of cattle in conformity with the provisions of G. L. c. 129, § 33; St. 1922, c. 353, § 3, as a result of which compensation was paid to him by the Commonwealth.  Rules promulgated by the division of animal industry under the provisions of the statutes in force in 1923 and 1925 required that an owner applying for such test should agree to comply with such rules as promulgated from time to time; that he should subject his entire herd to inspection; that every tested animal should be tagged; that the owner should add to his herd only animals which had passed a tuberculin test approved by the department; and that no payment under the statute should be approved by the director of the division of animal industry "if in his opinion an owner or his representative has by wilful act or neglect contributed to the spread of bovine tuberculosis."  In 1925 the second defendant, who testified that he knew that the first defendant had been buying cattle in the neighborhood, was asked by the first defendant to sign an application for a tuberculin test of his, the first defendant's, cattle, the first defendant giving as the reason for this request that he previously had one test in his own name and also saying something about the necessary length of time that must elapse before he could have another test made in his own name.   The second defendant complied, signing after the words "Owner's author-

ized representative." The test was made under the supposition, which the second defendant did not correct, that he was the owner, and, after the first defendant had signed a blank prescribed by the division of animal industry for a report of sales of reacting animals in which he stated that the first defendant had purchased such animals from the second defendant for a certain price paid by him to the second defendant for each animal, the second defendant filled out, signed and swore to a claim for salvage, a percentage of the difference between the value of the animals as appraised by the department and the price alleged to have been received from the first defendant, in which he made the statements, without any foundation of fact to support them, that no person other than himself had any claim on the animals, and that the salvage figures were correct. As a result he received a check for $924 from the Commonwealth, which he delivered to the first defendant. *Held*, that

(1) A finding was warranted that the defendants intended that the second defendant should pretend to be the owner of the cattle of the first defendant;

(2) Evidence that the first defendant told the department's veterinarian that he had a claim on the cattle would not justify a finding that the Commonwealth was thereby notified that he was the owner;

(3) The statements in the affidavit by the second defendant that he had received certain sums as salvage, and as to the ownership of the cattle, could be found to be material misrepresentations in the proceedings which resulted in obtaining money from the Commonwealth;

(4) It appearing that a claim by the first defendant for reimbursement, if presented, would have had to be passed upon in the regular way by the designated State officials, it was enough to warrant his conviction that it further appeared that he was responsible for the false representations, intending thereby to have his codefendant obtain from the Commonwealth money to which he was not entitled, and that the Commonwealth, relying upon them, parted with its property to his codefendant to its harm;

(5) The first defendant's fraudulent intent could be inferred from the conversation between him and the second defendant which in itself would justify the jury in inferring that the first defendant would not have been entitled to any reimbursement from the Commonwealth if he had asked for a test in his own name;

(6) The statement of sale by the second defendant to the first defendant being shown to be false, the first defendant had not laid the foundation for any payment either to himself or to the second defendant; and the Commonwealth was not required to go further and attempt to show whether or not the cattle were killed and, if killed, what the first defendant actually received for their carcasses;

(7) The evidence that the two defendants were acting with a common purpose, if believed, was sufficient to justify the application of the principle that the acts and statements of each in the execution of that purpose were the acts and statements of both;

(8) Whatever the effect upon the first defendant as between him and the second defendant of the representations as to the ownership joined in by them, prosecution of the indictment was not barred thereby;

(9) The fact, that one object of the Commonwealth in paying money under the statute was to assist an owner in ridding his herd of tuberculosis, would not prevent the jury from finding that it was induced to part with its money by the false pretences;

(10) Testimony by the senior clerk in the division of animal industry and by the veterinary inspector and by the deputy comptroller in the department of administration and finance was admissible to show their reliance on the false statements and what they would have done if they had known that certain of the statements were false;

(11) To prove that the Commonwealth delivered its check to the second defendant relying upon the truthfulness of the statements made by the second defendant and the first defendant, it was not necessary for the Commonwealth to call each person representing it in acting upon the defendants' claim; the defendants set the machinery in motion, the natural result of which could have been found to be a fraud upon the Commonwealth, and it was for the jury to say whether the inference of guilt was established beyond a reasonable doubt;

(12) Verdicts of guilty against the first defendant on both indictments were warranted.

The provisions of G. L. c. 129, §§ 11, 12, as amended by St. 1922, c. 353, §§ 1, 2, relating to compensation for animals killed by order of the director of the division of animal industry without previous appraisal, do not give an absolute right to compensation for cattle affected with tuberculosis and they have no application to the rights of an owner where cattle are killed following a tuberculin test made by agreement with the owner under authority of G. L. c. 129, § 33, as amended, and the rules of the division.

At the trial of the indictment for conspiracy above described, it was in evidence without objection that the second defendant had pleaded guilty and that he was represented by counsel when he did so. Subject to exception by the defendant, he gave the name of the attorneys who represented him. The judge charged the jury, in substance, that they could not consider the fact that the second defendant pleaded guilty to conspiracy in any way as evidence against the first defendant. *Held,* that the exception must be overruled, as the instruction protected the first defendant from any unfavorable inference from the fact that the plea was made in the circumstances disclosed by the evidence, including that which related to counsel for the second defendant.

INDICTMENTS, found and returned on October 29, 1926, the first indictment charging that Robert B. Young and Louis S. Jacobson on June 22, 1925, "conspired together to steal money of the amount and of the value in all of more than $100, the property of the Commonwealth of Massachusetts"; and the second indictment charging that the same defendants on June 30, 1925, did steal such money.

The defendant Young pleaded guilty to the first indictment, and the second indictment was nol prossed as to him.

The defendant Jacobson hereinafter will be referred to as the defendant.

The indictments then were tried together as to the defendant Jacobson before *Thayer*, J.

The only witnesses were those for the Commonwealth: Ralph E. Houghton, deputy comptroller in the department of administration and finance, Harry A. Thompson, assistant warrant teller in the office of the Treasurer and Receiver General, Anna H. Reed, senior clerk in the division of animal industry, Dr. James Dwight Pierce, veterinary inspector and agent of that department, and Robert B. Young, one of the defendants. Numerous documents and papers also were introduced in evidence.

Ralph E. Houghton testified as to the procedure in the State departments preceding the payment of money pursuant to the recommendation or warrants from the department of animal industry, and in particular that a schedule is prepared by the department of animal industry, approved by the director of the division of animal industry and by the commissioner of the department of conservation, and then forwarded to the comptroller's office on what is known as a warrant, and that thereafter they are sent to the Governor and Council for approval; that the schedule forwarded by the department of animal industry containing its recommendation on the payment of money in issue was as follows: "To the Auditor of the Commonwealth of Massachusetts. The Auditor is requested to pay on his certificate of payment by the Commonwealth the following named bills amounting to $15,202.94. They have been examined and approved by the Director of Animal Industry, Lester H. Howard, director, approved by Wm. A. Bazely, Commissioner; reimbursement for certain cattle killed under test." and among various items in a schedule there appeared the following: "71625 — Robert B. Young, Leominster, Mass. $924."

In cross-examination Houghton testified in part in substance that he had no connection with the department of animal industry except in so far as he was sent there to do particular work; that when the schedule came through from the department of animal industry bearing the approval of

the director, the payment of the money by the Treasurer of the Commonwealth followed as a matter of course generally; that he did not know whether any investigation was made after the schedule came from the department of animal industry to the comptroller's office and before the money was paid.

Recalled later, subject to exception by the defendant, Houghton was asked: "If you had known during the month of September, if you had known on September 24, 1925, when the certificate was received by your department from the division of animal industry including the item of $924 to Robert B. Young of Leominster that Mr. Young did not own any cattle; and that the cattle described in the papers that were offered through you this morning from the division of animal industry were in fact owned not by Young but by Jacobson, would that have any effect on the action you took in approving and forwarding the warrant to the treasurer? What effect would it have? What would you have done?" and answered: "Reported to the comptroller." In response to a question by the trial judge, he stated that it was not within his duty to issue the warrant for the payment of money. In further cross-examination he testified that if he knew Young was not the owner and that Jacobson was he would not have been satisfied himself, although the inspector or director of the division of animal industry had been satisfied to have the money paid to Young; that he would have called it to the attention of his superior officer.

Anna H. Reed, whose duty it was personally to check up the claim for salvage in issue at the trial but who had not the final and determinative authority to approve the claim, was asked, subject to exception by the defendant: "If you had known, Miss Reed, that Mr. Young did not own the cattle and never owned these cattle described in the sworn certificate entitled 'Claim for Reimbursement', but that they were owned by Louis S. Jacobson, would you have reported that knowledge while the schedules were being checked and prepared to your superiors?" and answered: "I would have reported it to my superior officer."

Dr. James Dwight Pierce testified that in July, 1925, he examined the herd in question and that the only information

he had as to the ownership of the cattle, other than the memoranda on the cards he received from the State House, was the statement by Jacobson that he had a claim on them. Subject to exception by the defendant, he then was asked: "If you had known, Dr. Pierce, that Mr. Young, Robert Young, never owned these cows, never had any claim on them, never had seen them, never bought or sold them to Louis Jacobson, would any of your actions or conduct or course of action that you have described in conducting the test and appraisal have been different from what you have related to us?" and answered: "If I understand this question, I don't think it would make any effect." Later, after cross-examination and subject to exceptions by the defendant, Dr. Pierce was asked: "This question is provoked by some of Mr. O'Toole's cross-examination. If you had known, Dr. Pierce, that Louis Jacobson owned the cows alone and Young had no interest in them, what effect, if any, would that have had on any of your actions that you have described that you have done?" and answered: "I doubt if he would be given a test."

Other material evidence is stated in the opinion. At the close of the evidence for the Commonwealth, the defendant rested and moved that verdicts of not guilty be entered. The motions were denied. The defendant was found guilty on February 16, 1927, and alleged exceptions, which were allowed on April 25, 1927.

The following provisions of G. L. c. 129 are material:

"Section 2. The director may make and enforce reasonable orders, rules and regulations relative to the following: the sanitary condition of neat cattle, other ruminants and swine and of places where such animals are kept; the prevention, suppression and extirpation of contagious diseases of domestic animals; the inspection, examination, quarantine, care and treatment or destruction of domestic animals affected with or which have been exposed to contagious disease, the burial or other disposal of their carcasses, and the cleansing and disinfection of places where contagion exists or has existed. No rules or regulations shall take effect until approved by the Governor and Council.

"Section 3.   The director shall make and prescribe forms for records of inspectors, certificates of examination, notices and orders of quarantine, notices and orders for killing and burial, and for returns of inspectors required by this chapter.

"Section 4.   The director may designate an employee of the division as clerk who shall keep the records of the division, shall certify copies of such records or of any order, rule or regulation issued by the director, and shall make any certificates of issuing, recording, delivering or publishing of orders required under this chapter."

"Section 11 (as amended by St. 1922, c. 353, § 1).   If the director, or one of his agents, by examination of a case of contagious disease of domestic animals, except foot and mouth disease, is of opinion that the public good so requires, he shall cause the diseased animal to be securely isolated or to be killed without appraisal or payment.   An order for killing shall be issued in writing by the director, may be directed to an inspector or other person, and shall contain such direction as to the examination and disposal of the carcass and the cleansing and disinfection of the premises where such animal was condemned as the director considers expedient.   A reasonable amount may be paid from the treasury of the Commonwealth for the expense of such killing and burial.   If thereafter it appears, upon post mortem examination or otherwise, that such animal was free from the disease for which it was condemned, an appraisal of such animal shall be made and the amount of appraisal value therefor shall be paid to the owner by the Commonwealth, except as otherwise provided in section fourteen relative to foot and mouth disease.

"Section 12 (as amended by St. 1922, c. 353, § 2).   If, under the preceding section, any cattle affected with tuberculosis are killed, the full market value thereof at the time of condemnation, not exceeding twenty-five dollars each, shall be paid to the owner by the Commonwealth if such animal has been owned by him for a period of not less than sixty days, and has been owned and kept within the Commonwealth for six consecutive months, both periods being next prior to its killing, or if it has been inspected within said

six months period and satisfactory proof has been furnished to the director, by certificate or otherwise, that it was free from disease on the date of such inspection, and if the owner has not, in the opinion of the director, by wilful act or neglect, contributed to the spread of tuberculosis.

"Section 12A (added by St. 1924, c. 304, § 1). If, under section eleven, any cattle affected with tuberculosis are killed, the full market value thereof at the time of condemnation, not exceeding twenty-five dollars each, shall be paid to the owner by the Commonwealth if such animal has been owned by him for a period of not less than sixty days, and has been owned and kept within the Commonwealth for six consecutive months, both periods being next prior to its killing, or if it has been inspected within said six months' period and satisfactory proof has been furnished to the director, by certificate or otherwise, that it was free from disease on the date of such inspection, and if the owner has not, in the opinion of the director, by wilful act or neglect, contributed to the spread of tuberculosis."

"Section 33 (as amended by St. 1922, c. 353, § 3). Except as otherwise provided, a person who has animals tested with tuberculin shall not be entitled to compensation from the Commonwealth for any animals which react to the tuberculin test unless they have been tested by the director or qualified veterinarians acting under his authorization. The director may prescribe rules and regulations for the inspection of cattle by the application of the tuberculin test and for the segregation or slaughter of reacting animals; provided, that no inspection by the application of such test shall be made unless an agreement has previously been entered into for such inspection and application with the owner of the animals or his representative. If, in the opinion of the director, any of the animals react to the test and are slaughtered in consequence thereof, the owner shall be reimbursed by the Commonwealth in the manner hereinafter provided. The director may appoint persons to make appraisals of reacting cattle in conjunction with the owner or his authorized representative. Such appraisal shall be subject to the rights of arbitration and petition set forth in section thirty-one; pro-

vided, that the award or damages shall be within the limits prescribed by this section.   The Commonwealth shall pay to the owner of any animal slaughtered under authority of any rules or regulations made hereunder one third of the difference between the amount received by the owner for the carcass of the animal and the value of the animal as determined by appraisal as aforesaid; provided, that in no case shall any payment by the Commonwealth hereunder exceed twenty-five dollars for any grade animal, or fifty dollars for any pure-bred animal; and provided further, that the owner or his representative has not, in the opinion of the director, by wilful act or neglect, contributed to the spread of bovine tuberculosis.

"Section 33A (added by St. 1924, c. 156).  Any bovine animal which reacts to a tuberculin test shall immediately be tagged for identification by the veterinarian, who has applied such test, by inserting into the external ear of the reacting animal a special metal tag provided by the director.  Any person who removes any such tag attached as above provided, or who in any way disposes of any animal which has reacted to a tuberculin test except for the purpose of immediate slaughter, or who neglects or refuses to have slaughtered a reacting animal sold to him for that purpose, shall be punished by a fine of not more than one hundred dollars or by imprisonment for not more than thirty days."

Rules and regulations adopted and promulgated by the director of animal industry under the above statutory provisions and in force at the times specified in the indictments were as follows:

"I.  An owner of cattle, wishing to eradicate tuberculosis if found in his cattle, and desiring assistance from the Commonwealth in the work of eradication and in the maintenance of his herd free from said disease, may request the director of animal industry to have a tuberculin test applied in accordance with Section 33, Chapter 129 of the General Laws, as amended by Section 3, Chapter 353, Acts of 1922.  Such request shall be made on a form prescribed by said Director and shall be signed by the owner or his authorized representative.

"II. Said owner or representative shall agree to comply with these rules and regulations and such additional rules and regulations as the said Director from time to time may prescribe.

"III. Said owner or representative shall submit his entire herd on any one premises for inspection and a tuberculin test at such times and by such methods as may be considered necessary by said Director. Before the test is applied, he shall give said Director complete information as to any previous tuberculin test of his herd or individual members thereof, and such other information regarding the prevalence of bovine tuberculosis as may be asked for by said Director or his representative.

"IV. The identity of every animal to which a tuberculin test is applied shall be established either by the insertion in its external ear of a metal tag provided by said Director, or by a certificate of its registration as a pure bred animal, or by any other method deemed practicable by said Director.

"V. Any animal which, in the opinion of said Director, reacts to the test shall not be disposed of in any way or leave the premises where tested except for immediate slaughter, or for segregation in accordance with a special agreement made by the owner or his representative with said Director. If to be slaughtered, said owner or representative shall make all arrangements therefor, shall pay all expenses incurred thereby and shall give due notice to said Director of time and place of slaughter. If segregated by agreement, its dairy products shall be completely pasteurized before being used for any purpose whatever.

"VI. Owners of cattle slaughtered under the provisions of said section 33 as amended, shall make affidavit on forms prescribed by the Director as to the amount of money received from the sale or disposal of the carcasses of the slaughtered animals.

"VII. Thorough cleansing and disinfection, and any repairs found necessary, shall be made by the owner who shall provide and pay for all materials used and the labor employed. Said cleansing, disinfection, and repairs necessary therefor, shall be done in accordance with the requirements

of said Director or his representative and may be officially supervised if deemed necessary.

"VIII.  An owner shall add to his tested herd only animals which have passed a tuberculin test approved by the Director of Animal Industry.

"IX.  No payment of money by the Commonwealth under the provisions of said Section 33, Chapter 129 of the General Laws amended as aforesaid, shall be approved by said Director, if in his opinion an owner or his representative has by wilful act or neglect contributed to the spread of bovine tuberculosis."

*M. M. Johnson,* (*G. E. O'Toole & A. J. Kittredge* with him,) for the defendant.

*C. B. Rugg,* District Attorney, (*H. W. Brown,* Assistant District Attorney, with him,) for the Commonwealth.

SANDERSON, J.  One of these indictments charges the defendants with conspiracy to steal; the other with stealing money of the value of more than $100, the property of the Commonwealth.  They grow out of transactions connected with tuberculin tests of a herd of cattle made under the provisions of G. L. c. 129, § 33, as amended by St. 1922, c. 353, § 3, and the rules and regulations prescribed by the director of the division of animal industry.  The indictment for larceny was nol prossed as to the defendant Young, who pleaded guilty to the indictment for conspiracy and was called as a witness by the Commonwealth in the trial of the defendant Jacobson on both indictments.

Jacobson was engaged in the business of selling meats and provisions and buying and selling cattle for slaughter. Young was cashier in a national bank.  In the summer of 1923, Jacobson applied for a tuberculin test of his herd of cattle, in conformity with the provisions of G. L. c. 129, § 33, as amended, as a result of which compensation was paid to him by the Commonwealth.  In 1925, he asked Young to sign an application for a tuberculin test of his (Jacobson's) cattle, giving as the reason for this request that he previously had one test in his own name and also saying something about the necessary length of time that must elapse before he could have another test made in his own name.

Pursuant to this request, Young made application for a tuberculin test of forty-nine cattle described as "my herd," signing his name thereto after the words "Owner's authorized representative." This application was given to Jacobson who forwarded it to the proper authorities in the division of animal industries at the State House. Subsequently a veterinarian from that department examined the herd then consisting of thirty-seven cattle; at this examination Jacobson was present and Young was not. All these cattle reacted to the test, and a numbered tag was attached to each. They were appraised, and their appraisal value entered on a blank form bearing the words "Owner Robert B. Young." This appraisal was signed by the veterinarian and by Young as "Owner, or Authorized. Representative," both certifying that the amounts recorded were fair and just estimates of the market values of the animals, and then forwarded to the division of animal industry.

Thereafter Young was requested to have the blank provided by the director for report of sales of reacting animals filled out and signed by the person to whom he had sold them. This was signed by Jacobson, and set forth, in substance, that Jacobson had purchased from Young the thirty-seven cattle that had reacted, and had actually paid Young or his agent therefor the amount set opposite each cow's number, totaling $800. There had in fact been no such sale or payment. After this report of the proceeds of sale was received by the department, the amount thereof was deducted from the appraised value and the sum to be paid Young as reimbursement was computed. The tabulation thus made was sent to Young upon the form to be executed by the owner in making his claim for reimbursement, with a request to sign as owner and to fill out an appended form if anyone else had a claim on the animals. Upon receipt of this document, Young said to Jacobson in substance that he disliked to sign and verify the untrue statements therein contained. Upon Jacobson's assurance that it was all right to execute the paper, that he was merely acting as Jacobson's representative, Young filled out, signed, and swore to the claim, making therein the state-

ments, without any foundation of fact to support them, that no person other than himself had any claim on the animals, and that the salvage figures were correct. When executed, this claim for reimbursement was handed by Young to Jacobson and forwarded to the division of animal industry. Later, Young received a check to his order from the Treasurer and Receiver General of the Commonwealth for $924, the amount stated in the claim. Young indorsed this check and gave it to Jacobson who deposited it in his bank account. Subsequently Young received a check for approximately the same amount from the Federal government as reimbursement from it for condemnation of the same herd as the result of the same tuberculin test. He likewise indorsed that check and gave it to Jacobson.

At the trial there was no contradiction of the testimony of Young, who was called as a witness for the Commonwealth, to the effect that he never owned the cattle in question or any others, never sold any cattle to Jacobson, and that the affidavit made by him of claim for reimbursement was incorrect and false. The jury were appropriately instructed on the issues involved and no exceptions were taken to the charge. The exceptions relate to the denial of the motion for directed verdicts and to the admission of evidence.

"Whoever . . . with intent to defraud, obtains by a false pretense, . . . the money or personal chattel of another, . . . shall be guilty of larceny." G. L. c. 266, § 30. "A false pretense, within the statute, is a representation of a material fact, calculated to deceive, which is not true." *Commonwealth* v. *Stevenson*, 127 Mass. 446, 448. There was evidence from which the jury could find that the defendants intended by the use of false pretences to induce the Commonwealth to part with its money when it otherwise would not have done so. *Commonwealth* v. *Coe*, 115 Mass. 481, 502. It is provided in G. L. c. 129, § 32, that tuberculin as a diagnostic agent for the detection of tuberculosis in domestic animals shall be used only upon cattle brought into the Commonwealth and upon cattle in certain designated quarantine stations, but that it may be used as such

diagnostic agent on any animal in any other part of the Commonwealth with the written consent of the owner or person in possession thereof.   G. L. c. 129, § 33, as amended, and the rules and regulations prescribed thereunder permit certain acts in connection with a tuberculin test to be performed by a representative of the owner, but the word "representative" as there used refers to a person authorized and purporting to act as agent of the owner and not to a person who pretends to be the owner when in fact he has no title to the cattle.   The jury could have found that the defendants intended that Young should pretend to be the owner of Jacobson's cattle.   The Commonwealth has no authority under the statute in question to pay money for reimbursement to any one except the owner or to pay such owner unless the cattle are slaughtered under the authority of the rules and regulations, and no money can be paid by the Commonwealth if, in the opinion of the director, the owner or his representative has negligently or by wilful act contributed to the spread of bovine tuberculosis.   If the name of the owner is kept from the director it is evidently impossible for him to form any opinion as to the conduct of the owner in this matter.

The evidence that Jacobson told the veterinarian that he had a claim on the cattle would not justify a finding that the Commonwealth was thereby notified that he was the owner. He did not so state and the Commonwealth had a right to rely on the statements under oath in the claim for reimbursement.

An apparent purpose of the Legislature in enacting St. 1922, c. 353, § 3, in amendment of G. L. c. 129, § 33, and of the director in promulgating rules thereunder, was to lend the aid of the Commonwealth to an owner of cattle who wished to eradicate tuberculosis if found in his herd.   The provisions of G. L. c. 129, §§ 11, 12, as amended by St. 1922, c. 353, §§ 1, 2, relating to compensation for animals killed by order of the director without previous appraisal do not give an absolute right to compensation for cattle affected with tuberculosis and they have no application to the rights of an owner where cattle are killed following a tuberculin

test made by agreement with the owner under authority of G. L. c. 129, § 33, as amended, and the rules of the director. The owner acting personally or by his representative must be the moving party under these rules by requesting a tuberculin test and agreeing to comply with the rules, and before the test is applied he is to give complete information as to any previous tuberculin test of his herd. The rules require the owner to make the affidavit as to the amount of money received from the sale or disposal of the carcasses of slaughtered animals, and permit an owner to add to his tested herd only animals which have passed a tuberculin test approved by the director of animal industry. The amount to be paid the owner for a grade animal is one third of the difference between the appraised value and the proceeds of sale, called salvage, if that third is $25 or less; but the amount so paid is not to exceed $25 in any event. The statements in the affidavit of Young that he had received certain sums as salvage, and as to the ownership of the cattle, could be found to be material representations in the proceedings which resulted in obtaining money from the Commonwealth.

Jacobson's claim for reimbursement, if presented, would have to be passed upon in the regular way by the designated State officials. It is enough, so far as this prosecution against him is concerned, if it appears that he was responsible for false representations, intending thereby to have his codefendant obtain from the Commonwealth money to which he was not entitled, and that the Commonwealth relying upon them parted with its property to Young to its harm. The fraudulent intent could be inferred from the conversation between Jacobson and Young which in itself would justify the jury in inferring that Jacobson would not have been entitled to any reimbursement from the Commonwealth if he had asked for a test in his own name. Enough has already been stated to show that upon a request for a tuberculin test an owner of cattle reacting to the test is not under all circumstances entitled to reimbursement and that there are some special provisions which might prevent such

reimbursement to a person whose herd previously had been tested. ·

By having Young appear as owner, Jacobson was in a position where he could avoid giving the complete information as to any previous tuberculin test of his herd or individual members thereof, required as a condition of having the test applied and he could make the false statement that he purchased the cows from Young and thus arbitrarily establish their salvage value. If the true owner's name appeared, this statement would be required from the person to whom he sold the animals for slaughter. With the false statement of the sale by Young in the case, the Commonwealth was not required to go further and attempt to show whether or not the cattle were killed and, if slaughtered, what Jacobson actually received for their carcasses. The defendant had not laid the foundation for any payment either to himself or to Young.

The evidence that Jacobson and Young were acting with a common purpose was sufficient to justify the application of the principle that the acts and statements of each in the execution of that purpose were the acts and statements of both. *Commonwealth* v. *Harley*, 7 Met. 462. *Commonwealth* v. *Mulrey*, 170 Mass. 103, 110. *Commonwealth* v. *Farmer*, 218 Mass. 507, 513. *Commonwealth* v. *Morrison*, 252 Mass. 116, 123.

The defendant Jacobson contends that the false statements as to ownership should be held not to be fraudulent but should be treated as true because of the doctrine of estoppel which would prevent him from denying, as to those who have acted upon them, that the title to the cattle was in Young, and relies in support of that position upon *State* v. *Asher*, 50 Ark. 427. Whether that case would be followed in this Commonwealth upon similar facts or whether such a defence is foreign to the purposes and theories of a criminal prosecution we need not decide, because the facts in the case at bar make the principle of the Arkansas case inapplicable. In that case it was held that by reason of the doctrine of estoppel the vendor suffered no harm. Here we are dealing with a statute which authorizes the payment of money by

the Commonwealth to the owner of cattle, not upon the title passing to it as buyer but upon the cattle reacting to a test applied under certain prescribed conditions and rules. So far as the Commonwealth is concerned, the person who is not the owner cannot become entitled to reimbursement as owner by pretending to be such, even if he makes this pretence by arrangement with the true owner, and for the reasons heretofore stated the jury could have found that the Commonwealth suffered harm by making the payment to Young.

Upon the record in this case there was nothing corresponding to the liquidated debt which existed in *Commonwealth* v. *McDuffy,* 126 Mass. 467. See *Commonwealth* v. *Burton,* 183 Mass. 461; *Commonwealth* v. *Peakes,* 231 Mass. 449, 457.

The fact, that one object of the Commonwealth in paying money under this statute is to assist an owner in ridding his herd of tuberculosis, would not prevent the jury from finding that it was induced to part with its money by the false pretences. "It is enough . . . if the fraudulent representation was a decisive although not the sole influence operating upon the mind of the person to induce the giving up of money. Other statements or considerations not amounting to false pretenses may co-operate to that result without impairing the force of the criminal act." *Commonwealth* v. *Farmer, supra.  Commonwealth* v. *Drew,* 19 Pick. 179, 183.  *Commonwealth* v. *Lee,* 149 Mass. 179.  The transaction was completed so far as the Commonwealth was concerned when its check was given to Young. The fact that he indorsed it to Jacobson is unimportant except for its bearing on their common purpose. *Commonwealth* v. *Harley, supra.  Commonwealth* v. *Langley,* 169 Mass. 89, 95.

A party defrauded may testify that the representations induced him to part with his property and that he would not have parted with it but for them. *Commonwealth* v. *Drew,* 153 Mass. 588. *Commonwealth* v. *O'Brien,* 172 Mass. 248. When false pretenses are made to obtain property of a corporation or of the Commonwealth, the persons who are

authorized to act for the corporation or the Commonwealth in the particular matter may give similar testimony as to the effect of the representations on their official action in the matter.

There was no error in admitting the testimony of the witnesses Reed, Pierce and Houghton tending to show their reliance on the false statements or what they would have done if they had known that certain of the statements were false. Each of them represented the Commonwealth in some capacity in connection with the tests or with taking the necessary steps to get money from the treasury of the Commonwealth into the hands of Young.

The evidence was sufficient to justify the jury in finding that the Commonwealth delivered its check to Young relying upon the truthfulness of the false statements made by Young and Jacobson. To prove this fact, it was not necessary to call each person representing the Commonwealth who acted upon the defendants' claim. The defendants set the machinery in motion, the natural result of which could have been found to be a fraud upon the Commonwealth, and it was for the jury to say whether the inference of guilt was established beyond a reasonable doubt. *Commonwealth* v. *Mulrey*, 170 Mass. 103, 108. See *Commonwealth* v. *O'Brien, supra,* page 256.

There is no occasion for considering evidence admitted or arguments made to which no exception was taken. It was in evidence without objection that Young had pleaded guilty to the conspiracy indictment. In cross-examination he said that in signing the papers he did not think that he was doing anything wrong, that he did not intend to defraud the Commonwealth of any money or to conspire with Jacobson to defraud the Commonwealth. He then testified without objection that he was represented by counsel when he pleaded guilty. When recalled, in redirect examination, subject to the defendant's exception, he gave the names of the attorneys who represented him. The bill of exceptions states that this testimony was commented on by the district attorney in argument. It also states that the attorneys named were well and favorably known in Worcester County,

but it does not appear that there was any evidence to that effect before the jury. The fact that Young pleaded guilty and was represented by counsel at the time having been introduced in evidence without objection, we are unable to see how the evidence naming counsel, even if improperly admitted, could be considered reversible error, whatever the standing of the counsel in the county may have been. This evidence added nothing material to the evidence already in the case and could not be held to have prejudiced the defendant's rights. We must assume that the jury followed the instructions given, which were, in substance, that they could not consider the fact that Young pleaded guilty to conspiracy in any way as evidence against Jacobson. "You give the fact that Mr. Young pleaded guilty no consideration whatsoever against the defendant Jacobson." *Commonwealth* v. *Richmond*, 207 Mass. 240, 251. This instruction protected Jacobson from any unfavorable inference from that plea as made under all of the circumstances disclosed by the evidence including that which related to Young's counsel.

All exceptions argued have been considered and in both cases the entry must be

*Exceptions overruled.*