COMMONWEALTH *vs.* H. HENRY ANTHONY & another
(and eighteen companion cases).

Suffolk.    April 1, 1940. — July 6, 1940.

Present: FIELD, C.J., DONAHUE, LUMMUS, & QUA, JJ.

*Larceny. Stockbroker. Embezzlement. False Pretences. Conspiracy.*

Evidence, at the trial of an indictment charging a member of a firm of stockbrokers with larceny, in substance that the defendant obtained a loan of securities from a customer by means of representations that the financial condition of the firm was sound so that the transaction would not jeopardize the safety of the securities, whereas he knew the firm was financially unsound, and that through the transaction the customer was deprived of the securities, warranted a conviction of the crime of larceny by false pretences under G. L. (Ter. Ed.) c. 266, § 30.

Evidence, that certain customers paid cash to a firm of stockbrokers employed generally as their agent to purchase certain securities shortly before the firm failed, that the securities never were delivered

nor the cash returned, and that upon failure of the firm no money or securities available for distribution to those customers existed, warranted a conviction of a member of the firm who had direct supervision of the office of the crime of embezzlement under G. L. (Ter. Ed.) c. 266, § 30, but did not warrant a conviction thereof of a second member of the firm who was the "outside man" of the firm and was not shown to have participated in the unlawful act.

Conviction of either of two partners charged with a conspiracy to commit larceny was not warranted where, while guilt of one defendant of larceny was shown, there was no evidence warranting a finding that the other in any way participated therein.

Use for the general purposes of a stockbrokerage firm of money collected and to be kept "intact" for the specific purpose of payment in advance for stock of a corporation which was to be formed to succeed the firm but which never was formed, warranted a conviction of a partner who actively participated therein of the crime of larceny by embezzlement under G. L. (Ter. Ed.) c. 266, § 30, but did not warrant conviction thereof of a second partner who, while he knew of and approved of the incorporation of the partnership, did not further participate in such sales or in the use of the proceeds thereof.

INDICTMENTS, found and returned on April 20 and 21, 1938.

The cases were heard by *Broadhurst,* J.

*T. B. Shea,* for the defendant Forgrave.

*S. S. Stoneman,* for the defendant Anthony.

*E. O. Proctor,* Assistant Attorney General, (*A. V. Sullivan,* Assistant Attorney General, with him,) for the Commonwealth.

QUA, J.   These are nineteen indictments, some of which are for larceny, and some of which are for conspiracy to steal, against two partners, H. Henry Anthony and William M. Forgrave, who had been carrying on a general stockbrokerage business under the firm name Brown, Anthony and Company.   Each defendant has filed a separate bill of exceptions.   In each case the only question that has been argued in connection with either bill is whether there was any evidence warranting the finding of guilty.

For convenience the cases will be divided into three classes, which will be considered successively, although all statements as to evidence and as to permissible findings are applicable, so far as pertinent, to all the cases.

1. We begin with a single indictment in three counts, alleging respectively that the defendants did steal certain

described certificates of stock, certain pieces of paper, and $36,786.25 in money, all alleged to be the property of Marguerite A. R. Holmes. The indictment concludes with the statement that the charges in all counts "are different descriptions of the same act." On this indictment Forgrave only was found guilty.

There was evidence tending to show these facts: In December, 1936, Forgrave told one Finn, an employee of the firm, that if Mrs. Holmes, who had been Finn's "customer," would put up her securities, then in the firm's possession for safe-keeping, as collateral so that "they" could borrow $20,000 on them Forgrave would give Mrs. Holmes four per cent interest. Finn asked Forgrave whether the loan was "absolutely safe," and Forgrave said it was. Finn then explained the proposition to Mrs. Holmes, telling her that "the securities would not be disturbed." On January 14, 1937, Finn brought Mrs. Holmes to Forgrave. Forgrave told her that the money was "absolutely safe"; that "everything" was absolutely safe and secure; that she need not worry; that her "securities would be kept intact." He gave Mrs. Holmes a firm check for $20,000, which she indorsed and turned back to him. He then gave her a note for $20,000 at four per cent interest, payable in one year, and signed          "Wm. M. Forgrave

Partner   Brown Anthony & Co."

Later the check was credited to the account of the firm, and its amount was credited to Forgrave's "capital account" in the firm of Brown Anthony and Co. On January 14, Mrs. Holmes also signed a "margin card," which it could be found turned her account with the firm from a "cash account" into a "margin account" and thus rendered her securities available to be pledged for loans of the firm. *Commonwealth* v. *Hull,* 296 Mass. 327, 331, 333. Mrs. Holmes never received her securities or their proceeds, although she demanded them. She testified that she understood she was giving authority to Brown, Anthony and Company to borrow on the securities, but did not think they would sell any, because Forgrave said the securities would be kept intact; that she understood Brown, Anthony

and Company were the borrowers; that Finn told her that the note handed to her was a partnership note; that she looked at it at the time, but did not notice that it was signed by Forgrave as partner of Brown, Anthony and Company; that "it all didn't sink in"; that she was not aware of the usual firm signature; that she went into Forgrave's office; that "there was a conversation there that this margin card was perfectly safe"; that this conversation was between Forgrave and herself, with Finn present; that Finn said "he could make . . . [her] extra money by signing the margin card"; that she said, "Now, Mr. Forgrave, you know just what I have. I don't want to take any chances"; that he replied, "there were no chances to be taken"; that she said, "That doesn't mean that you are going to sell my securities?" and he answered, "Oh, no, we are just going to use them for collateral. We are not going to sell any. We are keeping your securities intact, just as they are. You can have them back at any time." About that time Mrs. Holmes indorsed each of her stock certificates. These were afterwards pledged to banks as collateral for loans to the firm and most of them were sold by the banks to satisfy the loans.

Forgrave testified that the firm was to pay both interest and principal on the $20,000 note. It is difficult to reconcile his explanations of the form of the transaction. One of them was that the firm must first lend to Mrs. Holmes the $20,000 which she in turn immediately lent to him "for the use of the firm." He "assumed" that Mrs. Holmes knew that the note was not a partnership note.

There was evidence that at the time of the Holmes transaction the firm of Brown, Anthony and Company was in declining circumstances, and that securities used as collateral for its obligations were not "safe" and might not be kept "intact" and were in serious danger of being sold and lost, and that Forgrave knew the condition of the firm. There was evidence that as early as August, 1936, Forgrave had been informed by an accountant that an audit showed that if the firm was pressed on all its commitments at one time, it would have difficulty in meeting

its obligations. There was evidence that the net worth of the firm, exclusive of good will, as shown by the books as of January 1, 1937, was only about $7,000; that efforts were being made to get new money into the business; that there was discord between the partners; that the loss sustained in operation up to June 29 was $77,000; and that on the date last mentioned the firm made an assignment for the benefit of its creditors.

There was much evidence to the effect that Mrs. Holmes' had indorsed the check and received the note immediately before the statements hereinbefore mentioned were made to her by Forgrave. But the judge was not obliged to take the view that the transaction was fully completed and the check and note finally delivered before the statements were made. From the testimony of Finn in connection with the nature of the statements themselves the judge could find that the transaction did not become a finality until after Forgrave's statements were made, and that these statements were made for the purpose and had the effect of removing the lingering doubt in Mrs. Holmes's mind and so resulted in pushing the matter to a conclusion. Moreover, the judge could find that, before Finn brought Mrs. Holmes in to sign the papers, Forgrave had made, in answer to an inquiry by Finn, a false statement as to the safety of the proposed loan on Mrs. Holmes's securities with the expectation and intent that Finn should make a similar representation to Mrs. Holmes, and that in consequence Finn did represent to her that her "securities would not be disturbed."

It could be found that these representations as to the financial condition of the firm and as to the safety of the securities were more than mere expressions of opinion or prophecies as to the future, and that they amounted to statements of present fact. They were made by a partner, presumably, and as could be found actually, familiar with the underlying facts upon which the solvency of the firm and hence the safety of the securities depended. The positive character of the statements themselves would tend to create an impression of assurance and certainty based upon

knowledge of fact rather than upon opinion or judgment. It has been held in numerous cases that similar statements bearing upon a person's financial condition may be found to be statements of fact. *Safford* v. *Grout,* 120 Mass. 20. *Morse* v. *Shaw,* 124 Mass. 59. *Homer* v. *Perkins,* 124 Mass. 431. *Commonwealth* v. *Stevenson,* 127 Mass. 446, 448. *Andrews* v. *Jackson,* 168 Mass. 266. *Gurney* v. *Tenney,* 197 Mass. 457. *Commonwealth* v. *Riches,* 219 Mass. 433, 439. *Commonwealth* v. *Quinn,* 222 Mass. 504, 513-514. *Commonwealth* v. *Carver,* 224 Mass. 42. See *Burns* v. *Dockray,* 156 Mass. 135; *People's Savings Bank* v. *James,* 178 Mass. 322, 324, 325; *Shine* v. *Dodge,* 130 Maine, 440, 445. Compare *Deming* v. *Darling,* 148 Mass. 504.·

The evidence as a whole warranted findings that Forgrave by means of intentionally false material representations as to the financial condition of the firm and the safety of Mrs. Holmes's securities obtained her certificates for the benefit of his firm and himself and permanently deprived her of them. From all the facts an inference could be drawn of the criminal intent necessary to complete the crime of larceny by false pretences as embraced in G. L. (Ter. Ed.) c. 266, § 30. (See G. L. [Ter. Ed.] c. 277, § 41.) *Commonwealth* v. *King,* 202 Mass. 379. *Commonwealth* v. *Orler,* 252 Mass. 55, 59, 60, 63. *Commonwealth* v. *Bannon,* 254 Mass. 320, 323. *Commonwealth* v. *Coshnear,* 289 Mass. 516, 522, *et seq.* It is unnecessary to determine whether the evidence would have warranted a finding of a further false pretense that the note was a firm note.

2. We come next to five pairs of indictments in each of which pairs Forgrave and Anthony are jointly accused in one indictment of stealing (1) a stock certificate, (2) a piece of paper, and (3) money, all alleged to be the property of a named person who was a customer of the firm, the charges in all counts being alleged to be different descriptions of the same act, and in a second indictment of conspiring to steal the property, money, goods and chattels of the same person.

Important features are common to all these cases. In all of them there was evidence tending to show that the

customer ordered stock to be purchased by Brown, Anthony and Company and paid for it in full in advance either in cash or by proceeds from the sale of other stock, and that the stock purchased was never delivered to the customer. The dates of purchase ranged from about eight months to less than a week before the making of the assignment. In one of the cases the customer received a letter signed by the firm's cashier, enclosing a check for a dividend on the stock and stating, "We are holding the stock in safekeeping for you." In three of the cases there was in evidence a "confirmation and invoice" on which was printed, "We thank you for this business. Certificates will be transferred into customer's name immediately upon receipt of full payment by us, unless otherwise instructed." There was evidence that where, as in these instances, securities were purchased on a "paid account" and not on a margin account it was the practice of the firm, in the absence of instructions to the contrary, to have the certificate registered in the customer's name upon the execution of the order and to forward it to the customer as soon as possible. There was evidence in four of the cases that no contrary instructions were given. In the remaining case there was evidence that the customer had requested that securities purchased by him should be held in the firm's safe-keeping box in the firm name. In the same case there was evidence that the firm was "short" on the stock in question the day after it was purchased. In all of the cases, with the possible exception of one, there was evidence that the usual time for the delivery of the certificate to the customer had elapsed before, and in some cases long before, the assignment for the benefit of creditors.

In each of this group of cases it could be found that the customer paid his money into the firm, or appropriated his money in their hands, to be applied to a particular purpose only — the purchase of named stock which when purchased should be forwarded to or held intact for the benefit of the customer; that the accounts with these customers were all "paid accounts" and not margin accounts; and that the relation between the customer and the firm was a relation

of principal and agent and not a relation of creditor and debtor.   Upon these findings it would be the duty of the defendants to hold the money before the purchase and the securities after the purchase, in so far as the securities were to be held at all, in such manner that they would not be expended in behalf of the firm or become chargeable with its obligations.   No contention is made that either the money or the securities had been delivered to any of the customers either before or after the firm ceased to do business and went into the hands of an assignee.   Although the defendants testified at the trial, they did not disclose the present existence anywhere of a sum of money or of a body of stock free and available for delivery to these customers. Taking all the evidence together, the judge could find that the firm failed in the performance of its fiduciary duty by adopting in these instances methods of doing business which involved the commingling of the property of these customers with its own property in such manner as to incur risk of loss.   The necessary criminal intent on the part of the person or persons responsible for these transactions could be inferred from the other facts.   The judge could find that there had been larceny by embezzlement of either the money or the certificates of stock under G. L. (Ter. Ed.) c. 266, § 30.   *Commonwealth* v. *Tuckerman,* 10 Gray, 173, 201–207. *Commonwealth* v. *King,* 202 Mass. 379, 385, 392, 393. *Commonwealth* v. *Dow,* 217 Mass. 473, 479.   *Commonwealth* v. *Hutchins,* 232 Mass. 285.   *Gifford* v. *Eastman,* 251 Mass. 520, 524.   *Commonwealth* v. *Glassman,* 253 Mass. 65.   *Commonwealth* v. *Snow,* 284 Mass. 426.   *Gill* v. *Hornblower,* 294 Mass. 26, 28, 30.   *Commonwealth* v. *Hull,* 296 Mass. 327. *People* v. *Meadows,* 199 N. Y. 1.   *People* v. *Toohill,* 208 App. Div. (N. Y.) 174.   *Wahl* v. *Tracy,* 139 Wis. 668.

It must be remembered throughout that these were "paid accounts" or "cash accounts" and not margin accounts.   The brokers advanced no money of their own. See *Commonwealth* v. *Hull,* 296 Mass. 327, 330, 331, 333, 334, 335, 336.   Am. Law Inst. Restatement: Agency, § 425, comments (e) and (f).

There was no evidence of any special contract with the

customer mitigating in any way the legal obligation of the brokers that resulted in law from the nature of the transaction. See *Commonwealth* v. *Hull*, 296 Mass. 327, 332.

The cases are distinguishable from *Commonwealth* v. *O'Brien*, 305 Mass. 393, on the ground, among others, that the present cases, taken together, could be found to show a course of dealing intentionally pursued and inconsistent with the obligations of the firm to a class of customers.

Stress is laid in argument upon evidence that the firm was "long" on or in possession of the various stocks purchased at different times, including as to most of the stock the day of the assignment. Even if this evidence was believed by the judge, it was far from conclusive that there was no conversion. There was evidence that in arriving at a "long" position stocks "held as collateral on loans," stocks "in transfer" and stocks "owed" by other brokers but not paid for and thus only contingently available were included. There was no proof of the existence of a sufficient residuum of unencumbered stock such as formed the basis of the decision in *Gorman* v. *Littlefield*, 229 U. S. 19.

Inasmuch as crime is, in general, individual and personal, it becomes necessary to examine the evidence once more in order to ascertain whether either or both of the defendants bore such personal relation to the events described as to make him or them criminally liable. In *Commonwealth* v. *Stevens*, 153 Mass. 421, at page 424, it was said that ordinarily a master is not held criminally responsible for criminal acts of his servant or agent unless he in some way participates in, countenances, or approves them. *Commonwealth* v. *Morgan*, 107 Mass. 199, 203. *Commonwealth* v. *Riley*, 196 Mass. 60, 62. *Commonwealth* v. *Riley*, 210 Mass. 387, 396. Some exceptions to this rule have been recognized, but the Attorney General here concedes, we think rightly, that these cases are not within them.

Proof of personal participation by the defendants in, or of approval by them of the manner in which, the transactions in the group of cases now under examination was carried out is circumstantial rather than direct. The de-

fendants' denials of actual personal knowledge of these matters could be disbelieved. Certain other facts remain. The two defendants were the only members of the firm, and all authority given to the cashier, bookkeepers, clerks and salesmen must of necessity proceed from one or the other or both of them. Both defendants had keys to the "cage," but both went there infrequently, according to one witness Forgrave no more than ten times and Anthony no more than five times in the year preceding July, 1937. There was evidence that balance sheets showing the profits and losses of each day were furnished "to either Forgrave or to Anthony," and that monthly balance sheets were shown to Forgrave and sometimes to Anthony. There was evidence, apparently undisputed and not controverted in the arguments or briefs, that during nearly all of the time material to these cases, Anthony concerned himself more with the salesmen than with the management of the office. There was evidence that in February, 1937, his capital interest in the firm was reduced from fifty per cent to thirty-five per cent, and that Forgrave's interest was increased correspondingly; that Anthony became "more the outside man." There was evidence that Forgrave had supervision over the office, while Anthony was seldom there. It could be inferred that Forgrave would naturally remain familiar with what was going on at the office, and that the clerical force would look to him for direction and advice. In view of the number of instances in which larcenies of the same nature could be found to have occurred, involving, as could be found, a departure in some degree from the regularly established method of doing business, we think an inference could be drawn that these were not wholly the acts of subordinate employees having no personal interest in securing more cash for the firm, and that Forgrave knew and approved of the course adopted. A similar inference was drawn from somewhat similar facts in *Commonwealth* v. *Moore*, 166 Mass. 513, 516. See *People* v. *Sugarman*, 216 App. Div. (N. Y.) 209.

The cases stand differently as to Anthony. From the mere fact of partnership in a large business of this kind

an inference would not be warranted that both partners knew and approved of every action taken. *Sleight* v. *United States*, 82 Fed. (2d) 459. Whatever the fact may have been, we think that the evidence in these records falls somewhat short of enough to prove Anthony's guilt in this group of cases. See *Brown* v. *Garey*, 267 N. Y. 167. We are also of the opinion that the evidence will not sustain the charges against the two defendants of conspiring together.

3. The third class of cases includes four pairs of indictments in each of which pairs the defendants are jointly accused in one indictment of stealing money (and in one instance a stock certificate and a piece of paper also), the property of a named person, and in a second indictment of conspiring to steal the property, money, goods and chattels of the same person.

In the cases of this group it could be found that in May, 1937, the month preceding that in which the assignment for the benefit of creditors was made, the defendants discussed between themselves and with various employees of the firm the idea of incorporating the firm's business and selling $50,000 worth of six and one half per cent preferred stock. A lawyer was consulted, and by May 26 the legal papers necessary for incorporation were practically completed. After that nothing further seems to have been done. No application for a charter was filed. There never was any incorporation. In the meantime salesmen of the firm, with the knowledge and consent of both defendants, began selling the proposed preferred stock, "if, as and when issued." The defendant Forgrave told salesmen that the firm was expanding rapidly; that this "additional capital" was desired in order to take advantage of opportunities to increase the business; that the preferred stock was "a perfectly safe thing"; that the "company" was perfectly safe; and that the money received for sales of this stock in advance of its issue would be "impounded" or kept "intact" until the stock was issued. In fact the money was deposited in "the general funds of the firm." The defendant Forgrave testified that he told the auditor of the

firm to segregate and keep distinct moneys received from the sale of this stock.   Both the auditor and the cashier denied having received such instructions.   This group of cases relates to instances in which persons bought and paid in full in advance for this stock which was never issued.   No contention is made that their money was ever returned to them.

For reasons similar to those more fully stated in connection with the second group of cases it could be found that in the cases last above described the purchasers had placed their money in the hands of the firm as their agent to be held for a specific purpose; that instead of holding the money for that purpose the firm fraudulently converted it to the use of the firm.

It could be found that Forgrave took the initiative in forming the new corporation and in arranging the details of that enterprise and that, with his control of the office, he knew and approved of the disposition being made of the moneys received for advance sales of the preferred stock. His testimony that he had directed these moneys to be held intact was contradicted and could be disbelieved.   There was evidence to support the findings of guilty against him on the charges of larceny.

There was evidence that Anthony knew of and approved the proposed incorporation and took some part in the discussions about it.   There is nothing more against him. There is no evidence that he knew the moneys received were not being kept intact, and his connection with the management of financial affairs is not, in our opinion, shown to have been such as to justify an inference that he knew and approved of what was done.   Anthony cannot be found guilty in these cases, and neither defendant can be found guilty of conspiracy.

The exceptions of the defendant Anthony are sustained in all the cases to which they apply.   The exceptions of the defendant Forgrave are sustained in all the cases wherein he is charged with conspiracy and are overruled in all the other cases.

*So ordered.*