COMMONWEALTH *vs.* GEORGE S. MYCOCK & another (and two companion cases[1]).

Bristol.   December 7, 1943. — December 27, 1943.

Present: FIELD, C.J., DONAHUE, LUMMUS, QUA, & COX, JJ.

*Larceny. Conspiracy.   County.   Tuberculosis Hospital.   Public Health. Practice, Criminal,* Appeal with assignments of error.

An appeal under G. L. (Ter. Ed.) c. 278, §§ 33A–33G, with assignments of errors alleged to have been committed at the trial of an indictment charging conspiracy to steal was dismissed since the procedure provided by those sections has no application to misdemeanors.
One participating with another in planning and carrying out a scheme whereby the other person obtained money by false pretenses might properly be convicted of conspiring to steal and of stealing although he did not receive nor plan to receive any of the money so obtained by the other person.

---

[1] The companion cases are Commonwealth *vs.* George S. Mycock and Commonwealth *vs.* Gustave Reinhagen.

Evidence warranted findings that a dealer supplying a tuberculosis hospital with meat over a period of several months systematically charged and was paid by a county for more meat than he delivered and that he and the steward of the hospital, whose duty it was to purchase its supplies and to approve the bills therefor, were guilty of conspiring to steal and of stealing from the county.

A larceny accomplished by a dealer's receiving payment from a county for "padded" bills for meat sold to a tuberculosis hospital established under G. L. (Ter. Ed.) c. 111, §§ 78–91, was from the county, which in the first instance was obliged to maintain the hospital and accordingly paid the bills from its own money, although any loss resulting from the larceny would ultimately fall on the towns comprising the hospital district.

THREE INDICTMENTS, found and returned on November 4, 1942.

The cases were tried before *Goldberg, J.* Following verdicts of guilty, there were appeals with assignments of error in all the cases, and also a bill of exceptions in the first case.

*H. F. Hathaway,* (*J. Seligman* with him,) for the defendants.

*F. G. Volpe,* Assistant Attorney General, for the Commonwealth.

LUMMUS, J. A jury returned a verdict of guilty against the defendants upon an indictment charging conspiracy to steal from the county of Bristol. Each defendant was also found guilty by the jury upon a separate indictment charging him with larceny of more than $100, the property of the county of Bristol. The cases were tried together. *Commonwealth* v. *McKnight,* 289 Mass. 530, 539.

The judge ordered that the trial be governed by G. L. (Ter. Ed.) c. 278, §§ 33A–33G. Those sections have no application to misdemeanors. Conspiracy is a misdemeanor. Therefore the appeal under those sections in the conspiracy case must be dismissed. *Commonwealth* v. *McKnight,* 289 Mass. 530, 537. But the difficulty was obviated by the allowance of a bill of exceptions in the conspiracy case. The only question raised by that bill of exceptions, and by the appeals and assignments of errors in the larceny cases, is whether there was sufficient evidence to warrant verdicts of guilty in the several cases.

There was evidence of the following facts. Since Feb-

ruary 1, 1941, Mycock has been steward at the Bristol County Tuberculosis Hospital at Attleboro, and as such has purchased meats and other supplies for the hospital. Bills for meats, before being paid monthly by the county treasurer, had to be approved, first by Mycock, then by the superintendent of the hospital, and then by the county commissioners, who acted as trustees of the hospital. The hospital used the best and heaviest meats in the market. Prices were fixed by the pound.

Reinhagen was a small wholesale dealer in meats, having no place of business, but selling from his truck. He had facilities for storing not more than one hundred pounds of meat. He delivered his meats on the same day that he got them. There were large wholesale dealers with places of business in the hospital district, which included all of Bristol County except the cities of New Bedford and Fall River. Both Mycock and Reinhagen lived in the village of Assonet in Freetown, and had been neighbors and friends for years. Through an introduction by Mycock, Reinhagen began to sell meats to the hospital shortly before Mycock became steward, and until November, 1942, he furnished more than half the meats used there.

In March, 1941, the head cook, a subordinate of Mycock, noticed that a sales slip delivered by Reinhagen called for more pounds of meat than the number marked on the package. He called the fact to the attention of Mycock, who said he would look into the matter. After that, Reinhagen never gave such slips to the cook, but gave them to Mycock. The latter kept them locked up, and the cook never saw one again. Mycock, in his testimony, denied that the cook had called any overcharge to his attention.

In the summer of 1942, the Office of Price Administration, a Federal wartime agency with broad powers over rationing and prices of food, investigated Reinhagen's transactions. Mycock told the investigators that he did not weigh meats when received unless he had reason to question the weight. Reinhagen gave them a signed statement in which he said that he had no scales, and that he weighed his meats either at the packing houses or at the places of business of his

customers. He said that he had to buy more pounds of meat than he sold, because he had to take out bones and cut off waste parts, and that the customer was charged only for the number of pounds he got. He named five packing houses as his sources of supply. He named no other sources of supply, although he said that he made some purchases from his own customers and other retail stores when the packing houses did not have the particular thing he needed.

The investigators prepared a chart, which was introduced in evidence without objection, showing for the first nine months of 1942 the amounts of different kinds of meat furnished the hospital by Reinhagen on different dates, according to his bills approved by Mycock and paid by the county treasurer, and the amounts of such kinds of meat bought by Reinhagen from the five packing houses named by him on different dates, according to the books of the packing houses. In most instances the lots sold and bought compared closely enough to be identifiable. But almost invariably the amounts claimed by Reinhagen to have been delivered to the hospital exceeded by a few pounds, sometimes by twenty pounds or more, the comparable amounts bought by him. In more than thirty instances no record of any comparable purchases by Reinhagen could be found. The Commonwealth contended that cheating on weights was constant and systematic, and that in the instances where no record of purchase could be found no meat was actually delivered. The result would be that on a little more than $10,000 of bills during that period Reinhagen was overpaid about $3,000.

To explain the excess of the meat claimed by Reinhagen to have been delivered to the hospital, over the meat bought by him from the five packing houses named, Reinhagen testified that he also bought meat from retail dealers named Alves and Champagne, and often exchanged meat with them, giving them meat of lighter weight that he had bought from the packing houses and receiving heavier meat, paying the difference in cash. The alleged transactions with Alves turned out to be inconsiderable in volume. Rein-

hagen testified that he bought about twenty per cent of his entire supply from Champagne, more than he bought from some of the packing houses named by him as his sources of supply. Yet he did not mention Champagne to the investigators. Champagne testified in corroboration of Reinhagen. But it appeared that he was still selling meat for the hospital at the orders of Mycock. Both Reinhagen and Champagne testified that their transactions were all oral and for cash, and that no books, records, checks, bills or receipts concerning them existed. There was expert testimony for the Commonwealth that such exchanges of meat were unknown in the trade. During the summer of 1942 nearly thirty instances of apparent overcharge occurred, to which the explanation of purchases from or exchanges with Champagne would be applicable. Yet police officers who followed Reinhagen about for fifteen days during the summer testified that he never visited Champagne's store, although he often took meats from the packing houses named. The jury reasonably could disbelieve Reinhagen and Champagne, and could find that the five packing houses named constituted Reinhagen's only substantial sources of supply.

The defendants could be convicted of larceny and of conspiracy to commit larceny as charged, although the crime planned and committed was what was formerly described as obtaining money by false pretences. *Commonwealth* v. *Farmer*, 218 Mass. 507, 509. *Commonwealth* v. *Anthony*, 306 Mass. 470, 475. Mycock could be convicted as a principal without proof that he received or planned to receive any of the money paid to Reinhagen upon "padded" bills. In *Commonwealth* v. *Morrison*, 252 Mass. 116, the defendant Darling was held properly convicted of conspiracy to obtain money by false pretences and also of so obtaining it. His part in the crimes was to send to one Conners a fictitious order for obsolete and worthless goods, in order to induce Conners to buy them from his confederate Morrison and to pay Morrison for them. The report does not show that Darling received any of the money. It was said (page 123), "If two parties are working with a common purpose to obtain the money of another by false pretences, both are

criminally liable. 'The act of one was the act of both.'"
See also *Commonwealth* v. *Lane,* 254 Mass. 46, 49; *Common-
wealth* v. *Jacobson,* 260 Mass. 311, 327; *Commonwealth* v.
*Langley,* 169 Mass. 89, 95; *Commonwealth* v. *Mulrey,* 170
Mass. 103, 110; *Commonwealth* v. *Aronson,* 312 Mass. 347,
352; *Commonwealth* v. *Saul,* 260 Mass. 97; *Commonwealth*
v. *Lucas,* 2 Allen, 170; *Commonwealth* v. *Barry,* 125 Mass.
390. The conspiracy was not merged in the consequent
larceny. *Commonwealth* v. *Stuart,* 207 Mass. 563, 571. *Fox*
v. *Commonwealth,* 264 Mass. 51, 53.

From the evidence the jury could infer that Reinhagen
was systematically presenting bills for more meat than he
delivered to the hospital; that he would not have dared to
do so unless assured that Mycock would make no objection;
that Mycock's duty required him to see that the hospital
received the number of pounds stated on the sales slips;
that Mycock could not have been ignorant of such constant
and long continued overcharges as were made (*Common-
wealth* v. *Anthony,* 306 Mass. 470, 478, 479); that both de-
fendants conspired together to steal money on "padded"
bills, one presenting them and the other approving them,
and that they succeeded in having such bills, containing
false charges much exceeding $100, paid to Reinhagen by the
county treasurer. Such findings would support verdicts
of guilty against both defendants, of larceny as well as of
conspiracy.

The defendants contend that there was a variance, because
the larceny was alleged to have been from the county of
Bristol, while the evidence showed only larceny from the
hospital district. We do not suggest that any such variance
would avail the defendants. G. L. (Ter. Ed.) c. 277, § 35.
But there was no variance. The hospital was established
under St. 1916, c. 286, now G. L. (Ter. Ed.) c. 111, §§ 78–91.
By G. L. (Ter. Ed.) c. 111, § 85, the "care, maintenance and
repair" of such a hospital is to be provided for by the
"county," but after the end of the year the cost is to be
apportioned among the towns in the hospital district. If a
town fails to pay its share, the "county" may recover it in
an action of contract. To meet the cost of such "care, main-

tenance and repair" the county commissioners may borrow on the credit of the county.  § 85A.  The county commissioners are trustees of the hospital.  § 87.  Although any loss resulting from larceny by the defendants would fall ultimately upon the hospital district, when the "padded" bills were paid the money of the county was used to pay them, and the larceny was of the property of the county as alleged in the indictments.  There is nothing to the contrary in *Peck's Case,* 250 Mass. 261.

> *Appeals in the conspiracy case dismissed.*
> *Exceptions in the conspiracy case overruled.*
> *Judgments in the larceny cases affirmed.*