COMMONWEALTH *vs.* MARSHALL A. RIES
(and thirteen companion cases against the same defendant).

Suffolk.    January 6, 1958. — May 14, 1958.

Present: WILKINS, C.J., RONAN, WILLIAMS, COUNIHAN, & CUTTER, JJ.

*Larceny. Trust Company,* Officers and agents, Business. *Conspiracy. Practice, Criminal,* Venue; Trial of indictments together; Trial of defendants together; Requests, rulings and instructions; Disclosure of evidence before grand jury; Exceptions: whether error harmful; Argument to jury. *Pleading, Criminal,* Bill of particulars. *Evidence,* Admissions and confessions, Cumulative evidence, On redirect examination, Conversation. *Witness,* Claim of privilege. *Error,* Whether error harmful. *Constitutional Law,* Self incrimination.

There was no error in a criminal case in denial of a motion by the defendant for a change of venue grounded on the suicide on the morning of the day originally set for trial of one of the persons principally involved in the case and on extensive newspaper publicity given to the suicide. [568–569]

The matter of joint or separate criminal trials rests in the discretion of the trial court. [570]

Verdicts of guilty were warranted at the trial of indictments for larceny on evidence which would support findings that the defendant, upon whom a lender of money relied as a financial advisor in making certain loans, joined with and aided the borrower in obtaining the loans by false pretenses upon the security of wholly fictitious accounts receivable known to the defendant to be fictitious but represented by him to be genuine. [574]

An officer of a trust company might properly be found guilty of violating G. L. c. 172, § 16, forbidding him to receive fees or gratuities in connection with the bank's business on evidence that he introduced a customer of the bank wishing to borrow money to another customer of the bank who thereafter, personally or through corporations con-

trolled by him, made a series of loans to the first customer, that the mechanics of giving notes for the loans, making assignments on modified bank forms of purported accounts receivable as collateral security therefor, and making the payments to the borrower of the money lent, sometimes by treasurer's checks of the bank, were handled at the bank by the officer, that the notes when given were turned over to the bank's collection department and a substantial part of them collected by it, and that at the time of each loan the borrower paid the officer a certain percentage of its amount for which, before the making of the loans, the borrower had agreed to "cut . . . [him] in." [577–578]

A trial judge cannot be required to instruct the jury as to the legal effect of a mere fragment of the evidence or facts bearing upon an issue. [578, 582]

Evidence at the trial of an indictment for conspiracy to steal warranted a finding of guilty in that the defendant and a borrower of money engaged together in a scheme to defraud the lender by obtaining the loans to the borrower on the security of purported accounts receivable known by both the borrower and the defendant to be wholly fictitious. [580]

Statement as to the function of a bill of particulars in a criminal case. [580–581]

Under an indictment for conspiracy and a bill of particulars setting forth a detailed plan of conspiracy, it was not necessary for the Commonwealth to prove every detail so alleged, but only enough of the plan to show the conspiracy. [581–582]

No deprivation of due process of law or other error appeared in denying a pre-trial motion by the defendant in a criminal case for leave to inspect the transcript of his own testimony as a voluntary witness before the grand jury or in permitting the transcript to be read at the trial after the defendant had there been furnished with a copy. [583]

The defendant at a criminal trial was not harmed by error, if any, in the exclusion of certain testimony in cross-examination of a witness for the Commonwealth where the fact sought to be shown in such cross-examination was testified to by the defendant as a witness in his own behalf. [584]

Error was not shown at a criminal trial in permitting the Commonwealth to introduce a considerable amount of merely cumulative evidence. [584]

The mere fixing in cross-examination of the time when the witness had a certain conversation, without introducing the conversation, did not give the party calling the witness the right to introduce the conversation on redirect examination. [584]

Prejudicial error was not shown at a criminal trial in an exclusion of testimony on redirect examination of a witness for the defendant where no offer of proof was made. [584]

Counsel for the defendant in a criminal case was not entitled in his closing argument to the jury to comment on a refusal by a witness for the Commonwealth to answer a question asked on cross-examination on the ground that the answer might tend to incriminate him. [585–586]

FOURTEEN INDICTMENTS, found and returned on April 14, 1954, and May 24, 1954.

The cases were tried in the Superior Court before *Forte, J.*

*Robert W. Meserve,* (*Benjamin H. Lacy* with him,) for the defendant.

*John F. McAuliffe,* Assistant District Attorney, (*Gerald F. Muldoon* with him,) for the Commonwealth.

RONAN, J.   These are appeals under G. L. c. 278, §§ 33A–33G, as amended, following convictions for larceny, for taking gratuities as a bank officer in connection with bank business, and for a conspiracy to steal.

A general preliminary statement may be summarized from the evidence as follows: Ries for many years was a vice-president and a lending officer of a Massachusetts trust company located in Boston where he became acquainted with one Maitland in December, 1948. Soon thereafter Ries began to lend money of the trust company to Maitland upon unsecured loans. Early in January, 1954, Maitland had repaid all his loans from the trust company. In the spring of 1952, Ries interested one Kalman (or one of the seven corporations which he controlled, hereinafter referred to as Kalman) in lending money to Maitland who thereafter borrowed $1,166,950 on short term ninety day notes at the rate of $50 per $1,000, all of which purported to be secured by city purchasing slips,[1] every one of which was fictitious and worthless. When the Kalman transactions came to an end in the middle of February, 1954, Kalman was owed $243,800 which has never been repaid.

The defendant was tried on fourteen separate indictments

---

[1] These purchase slips were city of Boston service order forms supposedly made out by a specific department of the city to G. J. Maitland Co. Each slip listed the type, quantity, and price of the article included, and the appropriation code by a key number. The slips also specified that the amount payable would be due in ninety days. At the bottom of the form appeared an "Inspection and Completion Certificate" with the signed name of the purported receiving agent. Another blank at the bottom of the form entitled "Approval of Head of the Department" stated, "I hereby confirm the inspection and completion certificate and approve a payment in the amount of $ . . . for the service furnished." The total amount due was written in this blank and a rubber stamp was used for the purported signature of the department head.

consolidated at a single trial.[1]  In eight of them he was charged with larceny of more than $100 by obtaining money under false pretences from different corporations controlled by Kalman and from Kalman himself.  In five indictments there were alleged violations of G. L. c. 172, § 16, each of which charged Ries as a trust company officer with receiving gratuities in connection with bank business.  In one indictment the defendant was charged jointly with Maitland and one Wren with conspiracy to steal.  On this indictment, Ries was tried only with Wren.  Maitland was also charged separately with similar larcenies from Kalman.  It does not appear that Maitland has ever been put to trial on any indictment, but he was used as a witness for the prosecution. Ries was convicted on all of these indictments with the exception of certain counts which were waived by the Commonwealth and was duly sentenced but the sentences have been suspended to await the decision of this court.  On the conspiracy indictment, a verdict of not guilty was directed for Wren.

The defendant has set forth numerous assignments of error which he briefed and argued.  We shall follow that order.

1.  The third, fourth and fifth assignments of error are to the refusal to grant certain pre-trial motions.  The first group of these motions sought a change of venue.  Kalman committed suicide on the morning of the day originally set for trial.  The newspapers, as shown by the clippings introduced at the hearing, gave considerable publicity to the event both as to the space allotted to it and as to the contents of the articles, especially the relation of Kalman to the impending trial, and prophesied what result his death would have.  Some of the articles carried large headlines and were embellished with pictures of Kalman, his secretary, and his attorney.  Some of the articles contained a reference to a settlement made between Kalman and the trust company on account of the loss incurred arising from the bogus city purchasing slips.

---

[1] The defendant was acquitted on one indictment charging him with receiving gratuities as a bank officer and not included in these appeals.

Verification of the facts in a criminal prosecution in the county where they happened has been said to be one of the greatest securities of the life, liberty, and property of the citizen. Art. 13 of the Declaration of Rights of the Constitution of Massachusetts. That rule has been established by history and experience. The instant trial was to be held in Suffolk County unless the judge was satisfied in his judgment that a fair and impartial trial would not likely result if held there. That the judge was fully aware of his duty was apparent from his remarks from the bench during the hearing of the motions and was more evident during his charge when he instructed the jury, who had been segregated more than two weeks, that they should pay no attention to what they may have read or heard outside of the court room but that their decision must be based upon what occurred in the court room. There was no error in the denial of the motions for a change of venue. *Commonwealth* v. *Leventhal*, 236 Mass. 516, 524. *Commonwealth* v. *Millen*, 289 Mass. 441, 463–464. *Commonwealth* v. *Sheppard*, 313 Mass. 590, 594. *Commonwealth* v. *Bonomi*, 335 Mass. 327, 333.

Another motion requested that the indictment charging conspiracy to steal should be tried separately from the other indictments or in the alternative that Ries be tried separately from Maitland and Wren, also named as codefendants in that indictment.

Wren did not agree to waive a jury trial on the indictment charging conspiracy with Ries and Maitland. Maitland, who appears not to be represented by counsel, took no part at the hearing upon this motion but the district attorney opposed its allowance. After a hearing, the judge denied the motion. The statute provides that a defendant in a noncapital case may waive a jury trial "but not, however, unless all the defendants, if there are two or more charged with offenses growing out of the same single chain of circumstances or events whether prosecuted under the same or different indictments or complaints shall have exercised such election before a jury has been impanelled to try any

of the defendants. . . ." G. L. c. 263, § 6, as amended by St. 1933, c. 246, § 1.

The waiver of a jury trial was the only matter embraced in this motion that is regulated by statute. G. L. c. 263, § 6, as amended. All the matters embraced in the decision rested in the sound judicial discretion of the judge. There was no error. *Commonwealth* v. *Slavski*, 245 Mass. 405, 411–413. *Commonwealth* v. *D'Amico*, 254 Mass. 512, 514. *Commonwealth* v. *Sacco*, 255 Mass. 369, 413. *Commonwealth* v. *Snyder*, 282 Mass. 401, 410. *Commonwealth* v. *Millen*, 289 Mass. 441, 459–460.

The third group of motions sought a joint trial of Maitland with the defendant on the conspiracy indictment which we have already discussed and also upon the larceny indictments in which each was separately charged with offences based upon the same transactions. Whether there should be joint or separate trials rested in the sound discretion of the judge. We see no question of law involved in the denial of these motions. *Commonwealth* v. *DiStasio*, 294 Mass. 273, 279. *Commonwealth* v. *Barker*, 311 Mass. 82, 89. *Commonwealth* v. *Sheppard*, 313 Mass. 590, 595. *Commonwealth* v. *Blondin*, 324 Mass. 564, 573.

2. There was no error in the refusal to direct verdicts for the defendant on the larceny indictments upon the ground of insufficient evidence as set forth in assignment 18 nor upon the ground of variance as set forth in assignment 23.

A jury could find the facts herein recited under this heading. After Maitland had been borrowing from the trust company for more than three years by unsecured loans, he told Ries in March, 1952, that he wanted larger loans and asked him if he knew anyone who would be interested. He told Ries he wanted $100,000. Ries asked what he had for security and Maitland said that he had the city of Boston contract forms. Maitland also said, "They look good and they have never been questioned anywhere and I don't see any reason why it couldn't be used here as long as they are not checked up." A few days later Ries met Kalman at the trust company and then introduced him to Maitland.

Previously Maitland agreed that if he got the loans for five per cent Ries would be "cut . . . in at two." Kalman was a customer of the trust company and was a business acquaintance of the defendant for over ten years. Ries had in the past referred to Kalman four or five matters which the trust company could not itself handle. The defendant according to his own testimony had served with Kalman as a financial confidant and Kalman depended upon Ries to guide him in his transactions with Maitland. Ries introduced Kalman to Maitland and left them temporarily. Maitland agreed with Kalman to pay five per cent interest for ninety day loans and insisted that there should not be any checkup of the collateral. Later, and before any loan from Kalman, Maitland asked Ries if he was sure that there would be no checkup. Ries told him that Kalman "will not check up on it. You can be sure of that." Maitland replied, "You know, if there is a checkup on this after we take one of these loans, we will both be in trouble." Ries told him not to worry, there would be no checkup. Maitland agreed to pay Kalman five per cent interest and agreed to pay two per cent of each loan to Ries. There were about one hundred seventy-five transactions with Kalman and Ries received approximately $25,000.

The procedure was for Maitland to tell Ries how much money he wanted. Ries would telephone Kalman for the amount. Maitland would bring in a filled in city slip running to G. J. Maitland Co. Maitland would sign the assignment and the note that Ries made out. The assignment was made out by Ries upon a trust company blank by inserting the name of the lender as assignee. Ries also made out the note which Maitland signed payable to Kalman or whichever corporation was the lender. The collateral and assignment would be turned over to Kalman for his check or that of his lending corporation. Maitland's note would be turned over to the collection department of the bank for collection. On several occasions Maitland received treasurer's checks of the trust company, made out by Ries in his official capacity, instead of the lender's checks. The de-

fendant was paid by Maitland a commission of two per cent of the amount of the loan in cash when each particular Kalman loan was made.

On October 14, 1953, Kalman, Miss Sullivan, one Sieve and Ries met at a restaurant in Boston. Miss Sullivan was Kalman's secretary and Sieve had been his accountant for many years. Sieve said he was not satisfied with the manner in which the Kalman loans were being handled and that the order slips should be verified at the city hall. Kalman and Ries said that that could not be done as it would cause a lot of trouble. Sieve said it was only an ordinary procedure to check up on the receivables mentioned in the order slips to see if they were genuine. Sieve told Ries he could not understand why the city would object to a checkup of the security, but Ries insisted that "it would cause a lot of trouble if we did." As limited to bearing upon Sieve's mental attitude, he was allowed to state that he did not invite Maitland to the conference as Kalman told him that he depended mainly on Ries for advice. Ries stated to Sieve that these contracts of the city were genuine. Miss Sullivan heard Ries say that the city orders were valid papers. Upon the suggestion of Sieve that Maitland secure a life insurance policy on his life for $100,000, Ries had Maitland secure a policy for $50,000 which was assigned to Kalman.

During this conversation Ries told Sieve that the trust company thought very highly of Maitland and that he was a good risk. But from the time Maitland began to borrow from the trust company in December, 1948, until this conference, Maitland brought in financial statements to support his request for unsecured bank loans. All of these statements were accepted by Ries although he instructed Maitland in each case to show more assets. In fact, Ries added an explanation to the first statement submitted by Maitland. On one occasion Ries told Maitland in reference to his financial statement, "Bring it up and make sure that there is sufficient money showing in the left hand column to warrant the loan." It could have been found that Maitland

at Ries's direction showed more assets for each particular year than he actually had and consequently the net worth was higher than it should have been. In this view of the evidence it is immaterial whether his total net worth showed a decrease in some of the years in relation to the previous year. These financial statements continued until 1954 and each statement could be found to be false. It was open to the jury to decide that, during the years when Maitland borrowed from Kalman, the Kalman loans were not reflected in the financial statements because Ries instructed Maitland not to include them, that Kalman so far as appears never requested a financial statement of Maitland, that if Maitland carried two accounts at the trust company there was no change in the manner of carrying them after Maitland formed a corporation, and that outside of the few loans he obtained from the trust company during this period the principal credits to his accounts, if more than one, were the proceeds of the Kalman loans.

After the conference of October 14, 1953, Ries told Maitland that Kalman's accountant was suspicious about the collateral and could not understand why it had not been checked. The accountant desired to have the order slips contain copies of the invoices included in the orders and Ries advised Maitland to do so in order to keep the accountant quiet. Ries finally said that nobody would do any checking so long as he could talk to Kalman, and that Kalman "would rely on his word." No checking was ever done until after the loans from Kalman had ceased in February, 1954.

The main contention of the defendant is that he did not know that the order slips of the city were false and worthless while he was dealing with Maitland. It is indisputable that these slips represented fictitious transactions and that none of them was genuine. There is no dispute that Maitland knew they were false, had the blanks filled in, and used them as collateral security to borrow money from Kalman. If the order slips were genuine, any surplus that exceeded Kalman's equity belonged to Maitland and any deficit would have to be made good by Maitland.

Ries usually had Maitland transact his business at the trust company between 1:30 and 1:45 P.M. when there were not many people present. Ries told the grand jury that he was active in the Kalman transactions only during the final six or eight months when in fact he was the one who brought Kalman and Maitland together and was active from the beginning in the spring of 1952 with the exception of a period while he was on a vacation in 1953.

All the larcenies charged against the defendant occurred subsequent to the conference of October 14, 1953. There was evidence that Ries stated several times at this meeting that the city slips were genuine. Indeed a jury could easily find that one of the matters insisted upon by Ries in handling the Maitland and Kalman transactions was that the falsity and utter worthlessness of the city slips should not be disclosed.

Kalman was dead at the time of the trial but there was sufficient evidence that he relied upon the false representations of Maitland and Ries in lending money to Maitland. Ries admitted as a witness that he considered himself as a financial advisor to Kalman. He assured Maitland that there would be no checkup of the bogus collateral as long as he could talk to Kalman. As between Sieve's reasonable request for a checkup of the collateral and the opposing view of Ries, Kalman, who at that time was owed more than $200,000 by Maitland, took the advice of Ries and relied upon the latter. There was sufficient evidence that Kalman relied upon Ries in making the loans to Maitland. *Commonwealth* v. *Orler*, 252 Mass. 55.

The evidence was sufficient to show that Ries knew that the city slips were false and worthless; that he had joined Maitland in obtaining money from Kalman under false pretences; and that he had aided and abetted Maitland and at times had himself made false pretences. Both phases of his activities were presented to the jury. There was no error in refusing to direct verdicts for Ries on the indictments charging him with larceny. *Commonwealth* v. *Coe*, 115 Mass. 481, 501. *Commonwealth* v. *Farmer*, 218 Mass. 507.

*Commonwealth* v. *Orler,* 252 Mass. 55, 64. *Commonwealth* v. *Morrison,* 252 Mass. 116, 122. *Commonwealth* v. *Jacobson,* 260 Mass. 311, 323. *Commonwealth* v. *Anthony,* 306 Mass. 470, 475. *Commonwealth* v. *Aronson,* 312 Mass. 347, 352. *Commonwealth* v. *Mycock,* 315 Mass. 262, 266–267. *Commonwealth* v. *Green,* 326 Mass. 344, 349.

Similarly there was no error in refusing to direct verdicts on the larceny indictments on the ground of variance, as set out in assignment 23. Evidence of all the elements of obtaining money by false pretenses was introduced by the Commonwealth and was in substantial accordance with the material specifications. Ries fails to show that he was prejudiced. G. L. (Ter. Ed.) c. 277, § 35. *Commonwealth* v. *Meserve,* 154 Mass. 64.

3. Assignments of error as to the indictments charging the defendant with the receipt of gratuities in connection with business of the trust company are set forth in various forms. The general questions presented by all these assignments are raised by assignments 37 and 39 challenging statements made by the judge in his charge that as a matter of law the part that the trust company took in the making of the Kalman loans "did constitute business of the . . . trust company," and that the jury need not "worry about whether these activities were business of the trust company or not."

It is not disputed that the defendant was a vice-president and lending officer of the trust company, presumably employed on a full time basis. An officer, director, employee, or attorney of a trust company is prohibited by G. L. c. 172, § 16, as amended by St. 1934, c. 349, § 11, from receiving "any fee, commission, gift or other consideration for or in connection with any business of such corporation" with stated exemptions, none of which specifically covers the present cases. The statute was applied in *Commonwealth* v. *McKnight,* 289 Mass. 530, where the conviction of a president of a trust company who demanded and received a fee from a customer of the company as the price of securing a loan from the company was upheld.

The language of this statute prohibits in general terms the acceptance of fees or gratuities and exempts certain activities between the officer and the bank, as do G. L. c. 168, § 30, and c. 170, § 43, as appearing in St. 1950, c. 371, § 1, which prohibit an officer definitely and particularly from accepting a gratuity "for or on account of a loan" from a bank. Section 16 is not so confined. It applies to one who is an officer and receives a gratuity in connection with business of the trust company.

The contention of the defendant, with respect to assignments 37 and 39 and the judge's charge, is that it "cannot be ruled, as a matter of law, that the trust company activities specified and proved in this case were definitely business of the trust company within the contemplation of the statute." In effect the defendant agreed to the facts in so far as they relate to the extent that the trust company itself directly participated in the Kalman transactions (see *Commonwealth* v. *Gardner,* 241 Mass. 86; *Commonwealth* v. *Ross,* 248 Mass. 15; *Commonwealth* v. *Renfrew,* 332 Mass. 492; compare *Commonwealth* v. *Moniz,* 336 Mass. 178) but he now contends that these facts do not bring the transactions here considered within G. L. c. 172, § 16. The defendant's contention is untenable in view of all the circumstances here present, which are summarized in the following two paragraphs.

It does not seem to be disputed in the present record that there had been a considerable course of dealings, going back to 1946, between Kalman, and Ries as an officer of the trust company. Kalman was "a substantial customer of the . . . trust company" and one "concerning whom the employees . . . of the . . . trust company should be solicitous," for a substantial account was maintained in the trust company by Kalman and "a substantial amount accrued to the . . . trust company for . . . services rendered to him and for interest that he paid." In fact, Kalman borrowed some funds from the trust company to assist him in making some loans to Maitland. If the jury should conclude that payments were made to Ries by Maitland in connection

with these loan transactions, there was no evidence from which the jury could have found that Ries had disclosed these payments to Kalman and had effectively separated these transactions, by full disclosure to and agreement with Kalman, from the regular current of Kalman's dealings with Ries as an officer of the trust company, for Ries categorically denied that any such payments were made. Kalman himself requested that the mechanics of the loans to Maitland be handled through the trust company. Maitland also was a customer of the trust company, with whom Ries had dealt as an officer of the trust company.

In addition the undisputed facts of extensive use of the trust company's premises and facilities, taken in connection with the facts summarized in the preceding paragraph, confirm that the transactions were closely in connection with business of the trust company. The trust company collected $977,000 of Maitland's notes. In all, about one hundred seventy-five transactions were concerned. Notice had to be sent to Maitland of the due dates of the notes, and the payments by him and the delivery of the paid notes followed. All of the notes together with the assignments of the accounts were made upon the premises of the trust company at the desk of Ries upon forms used by the trust company after he drafted them to fit the loan Kalman was making. The collection department in collecting the notes was performing, of course, one of the usual functions of a trust company.

In the opinion of the court, all the facts summarized above taken together amply justified the trial judge in the present case in instructing the jury that the sole question before them upon the indictments under § 16 was whether Ries had received gratuities from Maitland. Under the undisputed circumstances revealed upon this record, they related to transactions with which business of the trust company was inextricably interwoven at every stage.

General Laws c. 172, § 16, is a penal statute and must be strictly construed. It does not definitely enumerate what

activities of a trust company officer are included within its prohibitions. We need not lay down the limits of this statute as it may apply in other circumstances to other persons who may be within its provisions. Upon the facts here established, we are satisfied that the activities of this defendant plainly brought him within its terms. It will be time enough to point out the boundaries and application of § 16 in other situations if and when the particular occasion arises. See *Commonwealth* v. *Wall*, 295 Mass. 70, 73; *Commonwealth* v. *DiStasio*, 297 Mass. 347, 365–366; *Commonwealth* v. *Bartholomew*, 326 Mass. 218, 222.

What has been said essentially disposes of the other assignments of error relating to the indictments under § 16. Assignment 19 is based on the alleged failure of the Commonwealth to prove that Ries received any gratuities in connection with the business of the trust company. Assignment 32 is to the failure of the judge to give an instruction that there could not be a conviction for receiving gratuities unless they were received in connection with the business of the trust company and not merely for the arranging by Ries of a loan by Kalman to Maitland. There is no merit to these assignments. The transactions sufficiently constituted or involved business of the trust company, so that if gratuities were found to have been paid, there was a violation of § 16. Also, since the facts in reference to the receipt of gratuities were in dispute, the defendant had no right to select some of the facts upon an issue, group them into a request, and have it given. *Commonwealth* v. *Broadbeck*, 124 Mass. 319. *Commonwealth* v. *Este*, 140 Mass. 279, 286. *Commonwealth* v. *Gavin*, 148 Mass. 449, 451. *Commonwealth* v. *Adams*, 186 Mass. 101, 107. *Commonwealth* v. *Johnson*, 188 Mass. 382, 387. *Commonwealth* v. *Borasky*, 214 Mass. 313, 321. *Commonwealth* v. *Turner*, 224 Mass. 229, 238. *Commonwealth* v. *Ginsberg*, 286 Mass. 326, 328. *Commonwealth* v. *Polian*, 288 Mass. 494, 500. *Commonwealth* v. *DiStasio*, 294 Mass. 273, 286. *Commonwealth* v. *Hayes*, 311 Mass. 21, 28. See also *Barnes* v. *Berkshire Street Railway*, 281 Mass. 47; *Friedman* v. *Huck's Transfer, Inc.* 329 Mass. 362, 364;

*O'Brien* v. *Boston & Maine Railroad,* 330 Mass. 347, 351.
Similar considerations control (1) assignment 33 to the fail-
ure to give request numbered 2 that the defendant could
not be found guilty of receiving a gratuity unless the jury
found that one or more of the functions performed in the
trust company, which the jury could "reasonably connect
to the receipt of" money by the defendant from Maitland,
"constituted actual business of the trust company"; (2)
assignment 34 to the refusal to grant the third request for
instruction that if the jury believed that the manner of
collection of the loans was a matter to which Maitland was
"indifferent" and for which he did not pay money, they
should not consider the "activities" of the collection de-
partment of the trust company as its business for or in
connection with which Ries received fees from Maitland;
and (3) assignment 35, based upon the refusal to grant the
fourth request for instruction to the effect that the issuance
of treasurer's checks of the trust company could not be con-
sidered as trust company business in connection with which
Ries received money.  When taken together with all the
circumstances here disclosed, the activities mentioned in
these last three assignments comprised actual business of
the trust company.

What has been said also disposes of (1) assignment 36,
based upon the refusal to grant the fifth request for a ruling
that certain facts there enumerated would not warrant find-
ing the defendant guilty of accepting gratuities unless the
jury further found that those gratuities were given not
merely for arranging the Kalman loans but also for and in
connection with the business of the trust company, and (2)
assignment 38 based upon the remark by the judge in his
charge that "all the loans were handled by Mr. Ries himself
as vice-president of the bank."  If this remark was error it
affords no basis for complaint under our interpretation of
§ 16.

4. Assignments relative to the conspiracy indictment.

Assignments 21 and 22 are based upon the refusal of the
trial judge to direct a verdict for the defendant because of

the alleged insufficient evidence and because of a variance
between the pleading and the proof. There was no error.
There was ample evidence to show that Ries and Maitland
were involved in a concerted scheme to defraud Kalman by
the use of false orders of the city of Boston and that Ries
well knew that such orders were false. The fact that Wren
was acquitted did not affect the existence of the plan be-
tween Ries and Maitland. The making out of notes and
assignments of the fictitious claims against the city by Ries,
the agreement before any loans were made to "cut" the de-
fendant in for two per cent, and the other evidence, taken
collectively, support the contention of the Commonwealth
that Ries was a confederate of Maitland as specified. *Com-
monwealth* v. *Hunt*, 4 Met. 111, 123. *Commonwealth* v.
*Riches*, 219 Mass. 433, 438. *Attorney General* v. *Tufts*, 239
Mass. 458, 493–494. *Commonwealth* v. *Morrison*, 252 Mass.
116, 123. *Commonwealth* v. *O'Brien*, 254 Mass. 86. *Com-
monwealth* v. *Fuller*, 260 Mass. 329, 333. *Commonwealth* v.
*Aronson*, 312 Mass. 347, 352. *Commonwealth* v. *Mycock*,
315 Mass. 262, 266–267. See *Commonwealth* v. *Shea*, 323
Mass. 406.

The aforementioned assignments of error and assignments
numbered 26 to 29 (relating to requests for instructions) are
predicated on the theory that the bill of particulars sets out
a definite description of a specific scheme to defraud and
that the prosecution must prove beyond a reasonable doubt
every allegation in the specifications describing the plan.
See *Commonwealth* v. *Hartwell*, 128 Mass. 415, 419–420;
*Commonwealth* v. *Pierce*, 130 Mass. 31. Compare *Common-
wealth* v. *Albert*, 307 Mass. 239, 244.

A bill of particulars cannot enlarge the scope of an in-
dictment to include an offence not charged therein. *Com-
monwealth* v. *Kelley*, 184 Mass. 320, 324. *Commonwealth*
v. *Sacco*, 255 Mass. 369, 412. *Commonwealth* v. *Lussier*,
333 Mass. 83, 91. Its primary purpose is to describe in
more detail that which is included in the allegations of an
indictment in order that the defendant may be fully in-
formed of the nature of the charge and be enabled to prepare

an adequate defence. *Commonwealth* v. *Belenski,* 276 Mass. 35. *Commonwealth* v. *Hayes,* 311 Mass. 21. *Commonwealth* v. *Giacomazza,* 311 Mass. 456. *Commonwealth* v. *Welansky,* 316 Mass. 383. *Commonwealth* v. *Noxon,* 319 Mass. 495. Thus the indictment and the bill of particulars are to be read together, *Commonwealth* v. *Albert,* 307 Mass. 239, 243, and cases cited, *Commonwealth* v. *American News Co. Inc.* 333 Mass. 74, 76; and the latter will restrict the scope of the former to the detailed specifications. *Commonwealth* v. *Albert,* 307 Mass. 239, 243. *Commonwealth* v. *Hayes,* 311 Mass. 21, 25. *Commonwealth* v. *American News Co. Inc.* 333 Mass. 74, 77. The same rule is applicable to detailed specifications in the indictment. *Commonwealth* v. *Hartwell,* 128 Mass. 415. *Commonwealth* v. *Meserve,* 154 Mass. 64. Specifications to an alleged charge, therefore, serve the same purpose and are governed by the same rules whether they appear in the indictment or are stated separately in a bill of particulars.

The important question in the instant situation is whether a detailed plan of conspiracy to defraud when specified in an indictment or a bill of particulars thereunder must be proved in every detail, see *Commonwealth* v. *Hartwell,* 128 Mass. 415, compare G. L. (Ter. Ed.) c. 277, § 35, or whether only enough of the plan to show the conspiracy must be proved as in *Commonwealth* v. *Meserve,* 154 Mass. 64. Had the specifications been in the form of overt acts rather than details of a concerted plan the result would be clear. No proof would be necessary in this jurisdiction. *Commonwealth* v. *Judd,* 2 Mass. 329. *Commonwealth* v. *Shedd,* 7 Cush. 514, 516. *Commonwealth* v. *Dyer,* 243 Mass. 472, 483–484. *Commonwealth* v. *Shea,* 323 Mass. 406, 412–413. But even in a jurisdiction where the overt acts must be alleged and proved it is not necessary to prove all the acts so alleged. *People* v. *Tavormina,* 257 N. Y. 84. See also *State* v. *Cassady,* 67 Ariz. 48. Compare *Levine* v. *United States,* 79 F. 2d 364, 369–370; *United States* v. *Dilliard,* 101 F. 2d 829, 832–833; *Holmes* v. *United States,* 134 F. 2d 125; *Todorow* v. *United States,* 173 F. 2d 439, 445.

The better rule is that the details of a plan of conspiracy are matters of enumeration rather than description and it is adequate if only sufficient details of the general plan that make out a conspiracy are proved. *Commonwealth* v. *Meserve,* 154 Mass. 64. Compare *Commonwealth* v. *Adams,* 127 Mass. 15; *Commonwealth* v. *Dowe,* 315 Mass. 217. See also G. L. (Ter. Ed.) c. 277, § 35. *Commonwealth* v. *Hartwell,* 128 Mass. 415, and *Commonwealth* v. *Pierce,* 130 Mass. 31, therefore are not applicable.

Assignment 30 is based on the denial of a request for instruction that it was immaterial that Maitland and G. J. Maitland Co. were not separate legal entities if Ries accepted in good faith, as a financial practice not indicative of a fraudulent intent, the treatment by Maitland of Maitland's personal account as separate from his business or "company" account. Even if Ries differentiated between the personal account and the business account of Maitland, that fact, if it was a fact, could be referred to in the charge if deemed by the judge to be of sufficient importance to a proper determination of the case. A judge ordinarily decides to what extent he will state evidence in his charge. He is not required to grant a request based upon a fragment of the evidence submitted upon a single portion of a more or less remote branch of a main issue such as the fraud of Ries. It was said in *Commonwealth* v. *Miller,* 297 Mass. 285, 287, "The requests for instructions for the most part asked the judge to comment upon particular facts supposed to tend in favor of the defendants. The judge was not bound to comply." It was stated by Qua, J., in *Commonwealth* v. *Payne,* 307 Mass. 56, 58, "Having given the jury a rule for their guidance, he was not required to discuss in addition particular possible states of facts upon which the jury could acquit the defendant." See also *Commonwealth* v. *Polian,* 288 Mass. 494, 499–500; *Commonwealth* v. *Beal,* 314 Mass. 210, 231; *Commonwealth* v. *Hoff,* 315 Mass. 551, 556; *Commonwealth* v. *Noxon,* 319 Mass. 495, 546–547. The rule is the same in civil cases. *Friedman* v. *Huck's Transfer, Inc.* 329 Mass. 362, 364. *O'Brien* v.

*Boston & Maine Railroad,* 330 Mass. 347, 351. Compare *Callahan* v. *Boston Elevated Railway,* 215 Mass. 171.

5. Assignments 1 and 2 are based upon the refusal of the trial judge to grant the defendant's pre-trial motions for an inspection of the transcript of the testimony given by Ries when he was a voluntary witness before the grand jury. Assignment 13 relates to the judge's allowing the reading of the aforementioned transcript at the trial after the denial of the request for an inspection of the transcript before the trial. That transcript contained at least one admission that Ries handled the Kalman transactions during the final six or eight months. There was no error.

Under our decisions the defendant had no right before his trial to examine the transcript of testimony of the grand jury proceedings. *Commonwealth* v. *Jordan,* 207 Mass. 259, 264–265. *Commonwealth* v. *Goldberg,* 212 Mass. 88, 91–92. *Commonwealth* v. *Gettigan,* 252 Mass. 450, 464. *Commonwealth* v. *Bartolini,* 299 Mass. 503, 508. *Commonwealth* v. *Giacomazza,* 311 Mass. 456, 461–462. *Commonwealth* v. *Galvin,* 323 Mass. 205, 211. The fact that the defendant wished to inspect only his own testimony voluntarily given before the grand jury does not require a different result. He had no right to compel the prosecution to provide him with a copy of his testimony. *Commonwealth* v. *Giacomazza,* 311 Mass. 456, 461–462. *Commonwealth* v. *Galvin,* 323 Mass. 205, 211. *Commonwealth* v. *Lundin,* 326 Mass. 551, 554–555. *Commonwealth* v. *Chapin,* 333 Mass. 610, 617–618. In the instant case Ries was given a copy of his testimony before it was read at the trial and several days before he became a witness in his own behalf. As was said in *Commonwealth* v. *Bartolini,* 299 Mass. 503, 508, cert. den. sub nom. *Bartolini* v. *Massachusetts,* 304 U. S. 565, the opportunity to inspect the transcript of evidence before a grand jury is a privilege and not a right in this jurisdiction, and where the defendant could inspect the transcript at the trial before it was presented by the prosecution the defendant was not deprived of his right to a fair and just trial. We see nothing in this situation inconsistent with the result in *Gordon* v.

*United States,* 344 U. S. 414, and *Jencks* v. *United States,* 353 U. S. 657.

6. Miscellaneous rulings on evidence.

Assignment 6 relates to the refusal to allow one Morse, a vice-president of the trust company, to answer on cross-examination a question as to what percentage of loans by the trust company secured by pledges of accounts receivable called for notice to the debtor on such accounts. The answer was sought to show that nonnotification financing was customary and that it would not necessarily raise suspicion if one should request that the debtor not be informed of the assignment of the accounts. But Ries, while he was a witness in his own behalf, testified that nonnotification financing was customary at the bank and that the want of notice to the city did not create suspicion as to the validity of the collateral. If there was error in excluding the answer the defendant was not harmed by the exclusion of the evidence.

Assignments 9 to 12 are on the ground that much evidence unnecessary and cumulative was introduced. The Commonwealth had the right to show the entire conduct of the defendant although the evidence became cumulative in places. *Commonwealth* v. *Scott,* 123 Mass. 222, 234–235. *Commonwealth* v. *Capalbo,* 308 Mass. 376, 383. *Commonwealth* v. *Rudnick,* 318 Mass. 45, 61. *Commonwealth* v. *Valcourt,* 333 Mass. 706, 712. Assignment 14, which attacks the great amount of cumulative evidence given by city of Boston employees as to the procedure in issuing genuine purchase slips, shows no error.

Assignment 17 is to the exclusion of further testimony on the redirect examination of the witness Greb. During the cross-examination the Commonwealth fixed the time of a certain conversation that the witness Greb had. It did not introduce any part of the conversation. *Commonwealth* v. *Taylor,* 327 Mass. 641, 651. This did not give the defendant the right to introduce the conversation. Even if it did, there was no offer of proof and the ruling not permitting its introduction was not prejudicial. *Commonwealth* v. *Bing-*

*ham,* 158 Mass. 169, 171. *Commonwealth* v. *Pelletier,* 264 Mass. 221, 225.

The other assignments based upon rulings on evidence which have not been waived have been examined and we find no need of reciting them. There was no error.

7. Maitland during cross-examination refused to answer a question, as to whether or not he included in his Federal tax returns the commissions he paid Ries on the Kalman loans, on the ground that the answer might tend to incriminate him. It is not questioned that he had the right to exercise his privilege, but the defendant contends that the judge was wrong in not permitting him in his closing argument to the jury to comment upon the exercise of the privilege by Maitland. The latter was a witness and not a defendant. He was claiming a privilege the exercise of which rested entirely with him. It was a personal matter independent of the prosecutor or counsel for the defendant. Neither should be favored or harmed by the choice of the witness. See *Andrews* v. *Frye,* 104 Mass. 234, 236; *Commonwealth* v. *Spencer,* 212 Mass. 438, 451–452. This is the rule set forth in *Beach* v. *United States,* 46 Fed. 754. See also *People* v. *Kynette,* 15 Cal. (2d) 731, cert. den. sub nom. *Kynette* v. *California,* 312 U. S. 703; *Powers* v. *State,* 75 Neb. 226; *State* v. *Harper,* 33 Ore. 524.

In this Commonwealth it is settled that if in the course of the trial the evidence tends strongly toward the defendant's guilt and there are persons available who by relationship or association with the defendant have knowledge of the material facts connected with the transaction for which the defendant is being tried and he would naturally be expected to call them as witnesses to aid him, his failure to call them and their absence not being sufficiently explained, then such failure may furnish foundation for the drawing of an adverse inference. It was said in *Commonwealth* v. *Finnerty,* 148 Mass. 162, 167, that such a principle was one which should "be applied cautiously." See *Heina* v. *Broadway Fruit Market, Inc.* 304 Mass. 608, 611–612. In *Commonwealth* v. *Spencer,* 212 Mass. 438, 451–452, the failure of the

defendant's wife to testify although present in the court room and not compelled to testify, G. L. c. 233, § 20, furnished a proper inference that if she was called as a witness by the defendant her testimony would be adverse to him. But at page 452 the court said, "If he had called her and she had refused to testify, then no inference could have been drawn against him. It then would have appeared that he had done all he could do to call her and avail himself of her evidence." In the instant case, Maitland was not a party and his assertion of a constitutional privilege rested with him alone. He was not within the control of either party and the exercise of the privilege by him could not affect him as a party and much less should it affect the actual parties where they have no control of his claim of privilege. We think the true principle is set forth in *Billeci* v. *United States*, 184 F. 2d 394, 398. We think that the correct rule is that, where a witness declines to answer a question on the ground that his answer would tend to incriminate him, the refusal alone cannot be made the basis of any inference by the jury, either favorable to the prosecution or favorable to the defendant. See Wigmore, Evidence (3d ed.) § 2272, note 9.

*Judgments affirmed.*